USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 95-1961 No. 95-1984 No. 95-2019 UNITED STATES OF AMERICA, Plaintiff, Appellee, v. CHARTER INTERNATIONAL OIL COMPANY, Defendant, Appellant. ____________________ ACUSHNET COMPANY, ET AL., Proposed Intervenors-Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Robert E. Keeton, U.S. District Judge] ___________________ ____________________ Before Cyr, Boudin, and Lynch, Circuit Judges. ______________ ____________________ David B. Broughel, with whom Jeffrey B. Renton, and Day, Berry & _________________ __________________ ____________ Howard were on brief, for appellant, Charter International Oil ______ Company. David M. Jones, with whom Roger C. Zehntner, Irene C. Freidel, _______________ __________________ ________________ Phoebe S. Gallagher and Kirkpatrick & Lockhart were on brief, for ____________________ _______________________ proposed intervenors-appellees, Acushnet et al. Evelyn S. Ying, Attorney, United States Department of Justice, _______________ with whom Lois J. Schiffer, Assistant Attorney General, Daniel C. __________________ _________ Beckhard and David C. Shilton, Attorneys, United States Department of ________ ________________ Justice, were on brief, for the United States as appellee. ____________________ May 9, 1996 ____________________ LYNCH, Circuit Judge. The clean-up of a Superfund LYNCH, Circuit Judge. ______________ hazardous waste site in New Bedford, Massachusetts is largely being accomplished and funded through agreements the government has reached with private parties who bear some legal responsibility for the wastes at the site. Those agreements, by law, must be approved by the United States Courts as being fair, reasonable, and consistent with the purposes of CERCLA, the Comprehensive Environmental Response, Compensation and Liability Act. Multiples of millions of dollars are involved in these settlements and the stakes are high, both for the public and for the parties involved. The allocation of responsibility for payment of those millions -- as between the public treasury and the private sector and amongst the private players themselves -- has given rise to complicated settlement dynamics. Those settlements are subject to both the court approval mechanism enacted by Congress and to specific statutory clauses providing for (and protecting against) contribution by some of the potentially responsible parties ("PRPs") to the settlement sums paid by other such parties. The question presented here is whether the district court abused its discretion in approving a CERCLA consent decree between the government and Charter International Oil Company arising out of the Sullivan's Ledge Superfund Site. What is unusual is that the government and Charter disagreed -2- 2 in a very fundamental sense on interpretation of the consent decree. This, in turn, raises the issue of the extent to which the scope of "matters addressed" in the decree, an issue usually resolved in separate contribution actions, was required to be determined by the district court in its approval of the consent decree. Under the rubric of approval of the decree, two sets of private parties here attempt to battle out the ultimate allocation of contribution liability in a clean-up with costs estimated to be in the order of $50 million. Charter urges that the district court erred in rejecting its interpretation, which would give Charter complete contribution protection against prior settlors for its payment of $215,000 plus interest. The Acushnet Group, comprised of prior settling parties who have instituted such a contribution action against Charter, urges that the district court erred in not resolving all contribution questions in the course of approving the decree. We affirm the district court's order. The Sullivan's Ledge Superfund Site ___________________________________ An old granite quarry in New Bedford was used as a waste disposal area by the city from 1935 to the 1970s. Local industries disposed of their wastes, including hazardous substances, into four pits, extending as deep into the bedrock as 150 feet. The contaminants from the wastes -3- 3 spread to adjacent areas, including some wetlands known as Middle Marsh. In 1984, the EPA placed the area, known as the Sullivan's Ledge Site, on the National Priorities List. See ___ 40 C.F.R. Pt. 300, App. B. It began its Remedial Investigation and Feasibility Study of the two "operable units" on the Site: the entire Site save for the Middle Marsh ("first unit") and the Middle Marsh ("second unit"). The EPA found significant hazardous substances in the groundwater, soils, and sediments of both units. In June 1989 EPA issued its Record of Decision ("ROD I") as to the first unit, calling for excavation of contaminated soils and sediments, construction of an impermeable cap over the disposal area, groundwater treatment and wetlands remediation. The government sued fourteen PRPs with respect to the first unit (the Acushnet Group), who settled. See United States v. Acushnet Co., Civ. No. 91- ___ _____________ ____________ 10706-K (D. Mass.). The district court entered a consent decree approving and finalizing the settlement (the "1991 Decree").  Under the terms of the 1991 Decree, the Acushnet Group paid $620,000 to the government for past costs incurred in connection with ROD I. The Group also agreed to perform the ROD I remedy, including the first thirty years of operation and maintenance, and to pay all of the EPA's -4- 4 oversight costs for the first five years and half of its oversight costs through the thirtieth year. On September 27, 1991, after completing its study of the contamination in the Middle Marsh wetlands area, the EPA issued its remedy for the second unit ("ROD II"). On April 26, 1993, the district court entered a consent decree approving the settlement between the government and fifteen PRPs (the Acushnet Group and the City of New Bedford). United States v. AVX Corp., Civ. No. 93-10104-K (D. Mass.) _____________ _________ (the "1993 Decree"). The 1993 settlors agreed to perform the remedy set forth in ROD II and to pay half of the EPA's oversight costs with respect to the second unit. Charter was offered the opportunity to participate in the 1991 Decree but declined it, saying that the price tag was too high for what it believed its liability to be. The parties to both the 1991 and 1993 Decrees understood that the government had a larger total claim relating to the Site than the recovery it had obtained from the initial settlors and that the government planned to seek further recovery from parties who had not yet settled. That is exactly what the government did, bringing a series of lawsuits against non- settling PRPs,1 including suit against Charter.  ____________________ 1. The government brought a cost recovery suit for its shortfall on the first unit against two non-settlors. United ______ States v. Cornell-Dubilier Electronics, Inc., Civ. No. 92- ______ ___________________________________ 11865-K (D. Mass.). The initial Cornell-Dubilier complaint ________________ sought approximately $2.8 million and a declaratory judgment -5- 5 Proceedings Against Charter ___________________________ The government pursued Charter under a theory of successor liability for a company, Pacific Oil, which had dumped soot from oil burners into the Sullivan's Ledge landfill.2 In June 1992 the government initiated independent settlement negotiations with Charter. On December 2, 1993, the proposed consent decree was lodged in the district court and notice was published in the Federal Register.3 58 Fed. Reg. 65,397 (Dec. 14, 1993). In  ____________________ that the defendants were liable for the government's future response costs not covered by the 1991 Decree. After entry of the 1993 Decree, the government amended its Cornell- ________ Dubilier complaint, adding three new defendants and seeking ________ an additional $1 million for costs relating to the second unit. The City of New Bedford, a defendant in Cornell- ________ Dubilier, has agreed to a proposed decree for unrecovered ________ costs from the first unit in satisfaction of the claims asserted against it in the Cornell-Dubilier suit. ________________ Similarly, seeking to recover its claims against parties not settling in the initial rounds, the Acushnet Group filed suit against twelve parties, excluding Charter. See Acushnet ___ ________ Co. v. Coaters, Inc., Civ. No. 93-11219-K (D. Mass.). ___ _____________ 2. Charter disputes the contention that the soot contained high concentration levels of hazardous substances. Further, there were two companies that used the name "Pacific Oil": Durfee Fuels, a Massachusetts corporation and Pacific Oil Company, a Rhode Island corporation. Charter claims that it was Durfee Fuels (to which it was not a successor) and not the Pacific Oil Company (to which it was) that dumped the soot.  3. Section 122(d)(2) of CERCLA requires the Attorney General to provide persons who are not parties to a proposed consent decree an opportunity to comment on the proposed consent decree "before its entry by the court as a final judgment." 42 U.S.C. 9622(d)(2)(B). Further, the Attorney General is obligated to "consider, and file with the court, any written comments, views, or allegations relating to the proposed -6- 6 response, the Acushnet Group filed comments voicing its concern that the decree might be interpreted to afford Charter contribution protection against the claims of settlors in the 1991 and 1993 Decrees. Charter responded in turn, asserting that the prior settlors' contribution claims against it were indeed impaired by the decree. In August 1994, the government made it clear to Charter that its position was that the decree did not grant Charter complete ___ contribution protection against the claims of prior settlors and that it would press this interpretation with the court. Given their differing interpretations of the decree, the government offered to let Charter withdraw, but Charter declined. On February 2, 1995, the government moved for entry of the Charter consent decree. It presented to the district court its position that the decree did not provide Charter with complete contribution protection against prior settlors. The district court consolidated the consent decree action and the contribution action filed by the Acushnet Group against Charter for the limited purpose of conducting a hearing to determine the impact of the contribution protection issue on entry of the decree. The Acushnet Group objected in the government's case to entry of the decree, but only if the  ____________________ judgment." Id.  ___ -7- 7 decree were interpreted to provide Charter with complete contribution protection.4 At the consolidated hearing, the court heard arguments on the proper interpretation of the decree. It gave Charter another opportunity to withdraw from the decree, but Charter again declined. The district court entered the decree, rejecting Charter's assertion that the decree afforded it complete contribution protection against prior settlors. The Acushnet Group's contribution action against Charter is currently pending before the district court. See ___ Acushnet Co. v. Charter Int'l Oil, Civ. No. 94-10989-REK (D. _____________ _________________ Mass.).  The Consent Decree on Appeal ____________________________ Two questions are raised by this appeal. The first is whether the district court abused its discretion in approving the consent decree.5 See United States v. ___ ______________ DiBiase, 45 F.3d 541, 544 (1st Cir. 1995). The second is _______ whether its interpretation of the decree was correct, a question which, to the extent it involves issues of law,  ____________________ 4. Charter's answer to the Acushnet Group's complaint in contribution asserted that the claims were barred because the proposed decree between Charter and the government would provide full contribution protection to Charter under Section 113(f)(2) of CERCLA, 42 U.S.C. 9613(f)(2).  5. Although jurisdictional issues over the Acushnet Group's proposed "intervention" in this appeal lurk in the background, we need not resolve them since the Group's challenge fails on the merits. See Menorah Ins. Co. v. INX ___ _________________ ___ Reins. Corp., 72 F.3d 218, 223 n.9 (1st Cir. 1995).  ____________ -8- 8 calls for fuller appellate review. See AMF, Inc. v. Jewett, ___ _________ ______ 711 F.2d 1096, 1100-01 (1st Cir. 1983). On the facts of this case, the first question cannot be answered without addressing the second. In approving a consent decree, the district court must determine three things: that the decree is fair, that it is reasonable, and that it is faithful to the purposes that CERCLA is intended to serve. DiBiase, 45 F.3d at 543; _______ United States v. Cannons Eng'g Corp., 899 F.2d 79, 85 (1st ______________ ____________________ Cir. 1990). This assessment entails, in part, an appraisal of what the government is being given by the PRP relative to what the PRP is receiving. What is being given by the PRP is clear: $215,000 plus interest. It is what is being received which implicates the district court's interpretation of the decree and the issue of contribution protection. We turn to the statutory scheme. In enacting the 1986 amendments to CERCLA known as SARA (the Superfund Amendments and Reauthorization Act of 1986), Congress provided settling parties with certain immunity from later contribution actions arising from "matters addressed" in the consent decree. Cannons, 899 F.2d at 91; 42 U.S.C.  _______ 9613(f)(2). As to such matters, "only the amount of the settlement -- not the pro rata share attributable to the ___ ____ settling party -- [is] subtracted from the liability of the non settlors." Cannons, 899 F.2d at 91. _______ -9- 9 Thus, because approval of a consent decree under CERCLA results in contribution protection to the settling party, it also affects the rights of PRPs who are not parties to the decree. The contribution issue, in turn, depends on the scope of "matters addressed" in the settlement, for: A person who has resolved its liability to the United States . . . in a judicially approved settlement shall not be liable for claims for contribution regarding matters _______ addressed in the settlement. Such settlement _________ does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement. 42 U.S.C. 9613(f)(2) (emphasis added). This statutory framework contemplates that PRPs who do not join in a first-round settlement will be left with the risk of bearing a disproportionate share of liability. "Disproportionate liability, a technique which promotes early settlements and deters litigation for litigation's sake, is an integral part of the statutory plan." Cannons, 899 F.2d _______ at 92. Further, the legislative history of SARA shows that Congress contemplated that there would be partial settlements which would leave settling parties liable for matters not addressed in the agreement: This protection attaches only to matters that the settling party has resolved with the [government]. Thus, in cases of partial settlements where, for example, a party has settled with the [government] for a surface -10- 10 clean up, the settling party shall not be subject to any contribution claim for the surface clean up by any party. The settlor may, however, remain liable in such instances for other clean up action or costs not addressed by the settlement such as, in this example, a subsurface clean up. Statement of Senator Stafford (sponsor of S. 51, the Senate bill for the 1986 SARA Amendments), 131 Cong. Rec. 24,450 (1985). Here, two groups are settlors and each seeks, on opposite sides of the coin, the value of the contribution proviso. The Acushnet Group, which settled earlier, wants its contribution rights against Charter arising from the Sullivan's Ledge Site clean-up maximized. Charter, a later settlor, wants to cut off all contribution claims against it. For purposes of establishing the scope of contribution protection afforded to Charter by the decree under 42 U.S.C. 9613(f)(2), it would be necessary to determine the scope of "matters addressed" by the decree. This case, however, involves approval of a consent decree and is not a suit for contribution. The district court believed, as do we, that it was required to resolve only certain aspects of the dispute over "matters addressed" in order to fulfill its responsibilities in evaluating the consent decree. Not every aspect of interpretation of a consent decree (or even the precise contours of "matters addressed") need be resolved in the course of approval of the -11- 11 decree.6 Rather, the court must address so much of the interpretation of the consent decree as needed to rule on the decree's fairness, reasonableness and fidelity to the statute.7 See United States v. Charles George Trucking, ___ ______________ _________________________ Inc., 34 F.3d 1081, 1088-89 (1st Cir. 1994). There may be ____ prudential reasons, as this case demonstrates, not to resolve more as to "matters addressed" than is necessary. Such reasons, for example, may be related to uncertainty as to the specific fact situations in which contribution claims may arise or to the absence of parties whose interests may be affected.8 As Aristotle noted, wisdom does not seek for  ____________________ 6. For example, in order to achieve an agreement the parties may, on relatively minor matters, engage in purposeful ambiguity, leaving to another day a battle which may never need to be fought. If that ambiguity is not material to the tripartite test for approving a consent decree, it would not be necessary to resolve it. Perforce, it may be preferable to leave it unresolved. 7. Although the option was open to it, the district court chose not to consolidate the approval of the consent decree and the contribution action, for all purposes. District courts may find such a consolidation useful, if the cases so warrant, to expedite and clarify matters. But they are not required to do so. See Fed. R. Civ. P. 42(a); 9 Moore's ___ _______ Federal Practice 42.02.  ________________ 8. The arguments of the Acushnet Group and Charter, that the district court was required to determine in the course of approving the consent decree all aspects of all possible contribution claims, prove too much. The district court noted that "[t]o the extent that there is uncertainty about the precise implication" that the settlement agreement may have, "it may be necessary in later proceedings for this or another court to interpret both the statute and the agreement." It would have been premature for the district court to issue a broad order without specific facts on which to base its ruling. Cf. Charles George Trucking, 34 F.3d at ___ _______________________ -12- 12 greater precision than the nature of the subject admits. Aristotle, Nicomachean Ethics I.3, 1094b23-28 (Martin Ostwald __________________ ed. & trans., 1962). Interpretation of the Decree ____________________________ We dispose first of an initial argument. The United States urges that, by consenting to entry of the decree, Charter has waived its right to challenge the district court's interpretation of the decree. We disagree. "[I]t is ______________ possible for a party to consent to a judgment and still preserve his right to appeal," so long as he "reserve[s] that right unequivocally." Coughlin v. Regan, 768 F.2d 468, 470 ________ _____ (1st Cir. 1985). Charter's Notice of Objection makes clear that it objected to, and intended to preserve its right to appeal, any interpretation of the decree that afforded it less than full protection against contribution claims arising out of the Sullivan's Ledge Site. That suffices. Charter says the decree must be interpreted so that the "matters addressed" by it encompass all aspects of the clean-up and remediation of the Sullivan's Ledge Site, including all "matters addressed" in the 1991 and 1993 Decrees. Charter argues, consequently, that it cannot be reached for contribution at all. The government says that  ____________________ 1088. The district court was also appropriately concerned that not all potentially affected parties were before it. The district court did what was necessary in order to decide the issues on approval of the decree and it was certainly not error to go no further. -13- 13 the "matters addressed" in the Charter decree do not include the clean-up work that the prior settlors are performing under their consent decrees. Therefore, it asserts that the Charter decree does not cut off completely the contribution rights of prior settling parties against Charter under Section 113(f) of CERCLA for costs of remediation of the Site. The government further says that the "matters addressed" in the consent decree encompass only the government's "remainder" case against Charter for that portion of the overall site liability that was not addressed in the prior settlements, i.e., the government's claim for ____ the past and future response costs that were not reimbursed or covered by the prior settlements and for implementation of those aspects of RODs I and II that are not performed by the prior settlors. The district court did rule on this dispute as to "matters addressed," and ruled against Charter. It left other aspects to be resolved in the parallel contribution action brought by the Acushnet Group against Charter.  In reviewing the district court's ruling on the "matters addressed" by the decree we look to the decree's "four corners." See United States v. Armour & Co., 402 U.S. ___ _____________ ____________ 673, 681-82 (1971). In United States v. ITT Continental _____________ ________________ Baking Co., 420 U.S. 223 (1975), the Court expounded on the __________ "four corners" rule of Armour: ______ -14- 14 Since a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any contract. Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree. Id. at 238. ___ The district court held that it would not interpret the decree as Charter contended and that such an interpretation "would be extreme in its consequence as to what the government gave up compared with the disproportionately small cash sum the government received in return." It further stated that such an interpretation would be "disapproved as contrary to the public interest." The determination of interpretation of the decree is iterative and proceeds incrementally, as in most areas of law, with priorities for reaching different levels of analysis. Cf. Lomas Mortgage, Inc., v. Louis, No. 95-1956, ___ ____________________ _____ __ F.3d __, __, slip op. at 9-10 (1st Cir. 1996) (statutory interpretation starts with the plain meaning of the statute, but where the statute is ambiguous, legislative history may be considered); Massachusetts v. Blackstone Valley Elec. Co., _____________ ___________________________ 67 F.3d 981, 987 (1st Cir. 1995) (same). As in most contract interpretation questions, we start here with the text. See ___ Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1083 (1st ___________________ ____________ Cir. 1989). -15- 15 Unfortunately, apparently due to EPA policy at the time,9 there is no explicit "matters addressed" clause in the agreement. Charter argues that, nonetheless, the district court should have interpreted "matters addressed" broadly in light of the contribution protection and covenant not to sue clauses of the agreement, as well as extrinsic evidence, particularly of the parties' negotiating history. In the absence of explicit language, the parties agree, citing to contribution cases from other circuits, one must first look elsewhere to determine "matters addressed." Different circuits have taken somewhat different approaches. In Akzo Coatings, Inc. v. Aigner Corp., 30 F.3d 761 (7th Cir. ___________________ ____________ 1994), the Seventh Circuit started with the decree itself, and, in the absence of an express "matters addressed" clause looked to various factors including "the particular location, time frame, hazardous substances, and clean-up costs covered by the agreement." Id. at 766. That court recognized, over ___ a dissent, that its "flexible, fact-based approach" would not offer the "settling parties the same degree of repose as one  ____________________ 9. The absence of specific language concerning "matters addressed" might be thought to be of concern to the EPA and the public. Having the scope of "matters addressed" specifically agreed upon should lead to greater certainty and finality. That certainty and finality are attractive inducements to settle. The uncertainty and continuing litigation which this case exemplifies could reasonably be thought to be a deterrent to others to settle with the government. Charter advises us that the EPA, in 1995, changed its policy to require that "matters addressed" be specified.  -16- 16 based solely on the facial breadth of the decree." Id. at ___ 767-68. The dissent preferred a broader reading, reasoning that more comprehensive contribution protection would lead to more settlements. See id. at 773 (Easterbrook, J., ___ ___ dissenting). The Tenth Circuit in United States v. Colorado _____________ ________ & Eastern R.R. Co., 50 F.3d 1530, 1538 (10th Cir. 1995), took __________________ a related "fact-specific approach," laying the earlier and the later "consent decrees [and their attachments] . . . . side by side and comparing the matters covered in relation to the remediation completed . . . . at the date of the [second] consent decree." We reject any argument that Section 113(f)(2) itself warrants a broad understanding of "matters addressed" by the decree, just as Colorado & Eastern, 50 F.3d at 1537- __________________ 38, and Akzo, 30 F.3d at 765, 770, rejected this argument. ____ The statute does not dictate any particular method for assessing the scope of the decree. See Akzo, 30 F.3d at 765. ___ ____ Thus, the district court appropriately rejected Charter's argument based on paragraph 16 of the proposed decree, which provides: With regard to claims for contribution against [Charter] for matters addressed in this Consent Decree the parties hereto agree that [Charter] is entitled to such protection from contribution actions or claims as is provided by CERCLA Section 113(f)(2), 42 U.S.C. 9613(f)(2). -17- 17 This language simply repeats the statutory contribution language of Section 113(f)(2), without defining "matters addressed." Charter says that this language in the decree would be meaningless unless its interpretation is adopted. That is not so. The language may provide protection to Charter should the government later recover from other parties a part of its claim.  We confine ourselves to the text of the decree and find the answer there, thus not reaching the issue of what other interpretive guides, if any, are permissible under CERCLA. We are unpersuaded by Charter's argument that the text of the decree supports its reading. We believe that the text of the decree as to: (i) the scope of the claims purported to be brought and settled; (ii) the definition of the response costs being reimbursed by the settlement; and (iii) the explicit references to the prior decrees, forecloses Charter's interpretation. Charter relies heavily on the decree's covenant not to sue clause, which prevents the government from suing Charter "pursuant to Sections 106 and 107(a) of CERCLA and Section 7003 of RCRA relating to the Site, including for reimbursement of Response costs or for implementation of ROD I or ROD II." But that the government has promised not to sue Charter says nothing about the intention as to whether other, prior settling parties were to have their rights of -18- 18 contribution against Charter extinguished by this agreement. The one does not necessarily follow from the other. Untoward and congressionally unintended consequences would flow from Charter's reading. As the Seventh Circuit observed in Akzo: ____ If the covenant not to sue alone were held to be determinative of the scope of contribution protection, the United States would not be free to release settling parties from further litigation with the United States, without unavoidably cutting off all private party claims for response costs. 30 F.3d at 766 (quoting brief of United States as amicus). We agree. The government may have reasons to give such a covenant unrelated to an intent to grant broad contribution protection against prior settlors. We find dispositive instead the text of the decree establishing that Charter was sued on the government's remainder case, that the government sought and Charter agreed to reimburse the government for its response costs as to that remainder case, and that the remainder case was defined against the backdrop of the prior settlements. The text describing the scope of the claims to be brought and settled undermines Charter's proposed interpretation: The United States in its complaint seeks reimbursement of response costs incurred and to be incurred by EPA and the Department of Justice for response actions in connection with the release or threatened release of hazardous substances at the Sullivan's Ledge Superfund Site in New Bedford, Bristol -19- 19 County, Massachusetts . . . and a declaration of the defendants' liability for further response costs. Neither the complaint nor the decree asserts a claim against Charter for the remediation work being done by the Acushnet Group. A reading of a decree which far exceeds the relief sought by plaintiffs' complaint would be strained and doubtful. See Navarro-Ayala v. Hernandez-Colon, 951 F.2d ___ _____________ _______________ 1325, 1341 (1st Cir. 1991). Even crediting the argument that some settlements may exceed the boundaries of claims made in the complaint,10 there is nothing in this decree to lead to that result.11  ____________________ 10. Cf. Charles George Trucking, 34 F.3d at 1090 (consent ___ ________________________ decree may resolve claims for damages not pleaded specifically, if the parties so intend, so long as the claims are within the general scope of the pleadings). 11. We note the potential problem of the government not honoring its agreement with prior settlors by collusively agreeing with subsequent settlors on language in their agreement broader than the claims the government made against those subsequent settlors. Cf. Akzo, 30 F.3d at 774 ___ ____ (Easterbrook, J., dissenting) (making an analogous point about the government inducing PRPs to enter large settlements with promises of broad contribution protection and then later urging the district court to arrive at a narrow reading). That is not this case. The district court here expressed its skepticism that the earlier settlement empowered the government to do whatever it wished about impairing the contribution rights that were retained by the prior settling parties. The government has expressly disavowed any such intention. In addition, the government has a serious disincentive to collude with later settlors to cut off the rights of prior settlors just to extract a higher second-round settlement in a single clean-up proceeding. It is the government that is the repeat player in the world of CERCLA clean-ups. Should ______ the government develop a reputation for cheating early settlors, that would deter settlements in later clean-ups -20- 20 The definition of response costs in the decree also does not support Charter's interpretation. The decree defines Charter's $215,000 payment as being "in reimbursement of Response Costs," which are defined as the government's ____________ response costs. The decree says "the United States has incurred, and will continue to incur, response costs which have not been recovered under the 1991 Consent Decree or the 1993 Consent Decree." The decree estimates the government's shortfall to exceed $4 million in such response costs. The decree also indicates that the government evaluated the $215,000 to be paid by Charter in terms of these unrecovered costs of at least $4 million and the risk that some remediation work may not be completed by other settlors. The amount was not evaluated against the total costs of clean-up at the Sullivan's Ledge Site.  Further, as the government points out, the Charter decree explicitly refers to the earlier decrees. In the prior settlements the Acushnet Group did not give up the right to seek contribution from those who were not part of those settlements. The prior settlements are explicitly referenced and described in the Charter decree. Under such circumstances we may consider these prior settlements in interpreting the decree. Cf. ITT Continental Baking, 420 ___ _______________________  ____________________ (and reduce the amounts early-round settlors are willing to pay) and hence, in the long run, hurt the government's interests. -21- 21 U.S. at 238. In light of these considerations, we hold that the text of the decree supports the government's interpretation and not Charter's and so affirm the district court's ruling on this point. Charter argues that the decree is ambiguous and that extrinsic evidence of the negotiating history of the parties demonstrates that Charter was intended to be protected from all contribution claims. Cf. Thomas Hobbes, Leviathan Ch. XI, ___ _________ at 84 (Michael Oakeshott ed. 1962) (1651) (men call indeterminate that which they wish to contest because they have interests at stake). While in routine contract interpretation extrinsic evidence may be considered when the disputed terms are ambiguous, we do not find the decree ambiguous, and such evidence may not be considered to contradict the written terms of the agreement. See Brennan ___ _______ v. Carvel Corp., 929 F.2d 801, 808 (1st Cir. 1991). ____________ Even so, we doubt, but do not decide, whether in interpreting a CERCLA consent decree it would be appropriate to rely on the type of extrinsic evidence Charter proffers. This court has at times considered certain types of extrinsic evidence in interpreting decrees in public institution civil rights actions. See Navarro-Ayola, 951 F.2d at 1343. But ___ _____________ CERCLA settlements, unlike ordinary contract formation, take place in a unique statutory framework. That framework requires that before a decree is entered by the court, notice -22- 22 of the decree be published, there be an opportunity for public comment, and that the Attorney General take account of the commentary and reserve the right to withhold consent should the commentary show the decree to be inappropriate. 42 U.S.C. 9622(d)(2). That public comment is part of the record before the district court. Id. The statutory ___ structure thus assumes that the public will be given access to the relevant documentary information on the decree. The evidence of the negotiating history which Charter proffered was not within the information the public had available.12 It is worth asking why the court should enter a consent decree when there was a fundamental dispute over the effect of the decree. There are two responses. The first is that Charter expressed its intent to live with whatever interpretation the court ultimately gave the decree. There is no unfairness to Charter. When Charter said that it had not understood the government's position to be that Charter would not be afforded complete contribution protection, the government offered to allow Charter to withdraw from the agreement. Charter declined. Charter knew the government would present a contrary interpretation to the district  ____________________ 12. Even were we to adopt Charter's method of analysis, we see nothing in the negotiating materials that indicates that the government intended to undercut its earlier settlements with the Acushnet Group or that it ever agreed with Charter's view on the scope of contribution protection afforded by the decree.  -23- 23 court. Charter also knew that courts are required to give some deference to the judgment of the Attorney General that the settlement is appropriate.13 Charles George Trucking, ________________________ 34 F.3d at 1085. In addition, the district court gave Charter the opportunity to withdraw from the settlement in the face of a contrary government position and the court's statement that it would most likely rule against Charter's interpretation. Charter again declined. Counsel for Charter informed the court that, win or lose in its interpretation of the decree, Charter preferred to have an agreement with the government. Such an agreement, Charter acknowledged, would both provide it with some contribution protection and get it out of costly litigation with the government. Indeed, on appeal, Charter does not ask us to vacate the decree. Rather its position is that the decree should be upheld and that its interpretation should be substituted for that of the district court. Second, while a different case might lead to a different result, we think that the policies behind CERCLA are better served here by holding Charter to the consequences of its roll of the dice. Perhaps mindful of the huge  ____________________ 13. We reject the Acushnet Group's argument that the district court is required to defer to the Attorney General's judgment to the extent of exercising no independent judgment of its own. See Charles George Trucking, 34 F.3d at 1085 ___ ________________________ (although in entering a decree a district court must defer to the EPA's judgment and to the parties' agreement, it has a responsibility to exercise its independent judgment). -24- 24 resources going into the transactions costs of CERCLA litigation, rather than to remediating the sites,14 Congress sought in SARA to encourage earlier resolutions by agreement. See United States v. SCA Servs. of Ind., Inc., ___ _____________ _________________________ 827 F. Supp. 526, 530-31 (N.D. Ind. 1993). If a party were permitted to use the consent decree process to delay, whether in good faith or by design, and then to undo a decree by saying its understanding of the base terms was different, then the congressional purposes would be undercut. Cf. ___ Menorah, 72 F.3d at 223. Given that Charter voluntarily _______ chose to consent to the decree, despite the significant risk of an interpretation contrary to its interests, it was not unreasonable for the district court to have entered the decree. Approval of the Consent Decree ______________________________ There was no abuse of discretion by the district court in approving the decree, as based on the government's  ____________________ 14. See Jan Paul Acton & Lloyd S. Dixon, Superfund and ___ ______________ Transaction Costs: The Experience of Insurers and Very Large _____________________________________________________________ Industrial Firms 32 (1992)(estimating that of the __________________ approximately $470 million paid in 1989 by insurers for hazardous waste clean-ups, 88% went to legal costs); see also ___ ____ Lloyd S. Dixon, The Transactions Costs Generated by _________________________________________ Superfund's Liability Approach 183, in Analyzing Superfund: _______________________________ __ ____________________ Economics, Science and Law, (Richard L. Revesz & Richard B. ___________________________ Stewart eds., 1995)(noting that for 1991 alone the private sector incurred over $4 billion in transactions costs); William N. Hedeman et al., Superfund Transaction Costs: A _______________________________ Critical Perspective on the Superfund Liability Scheme, 21 _________________________________________________________ Envtl. L. Rep. 10413, 10423 (1991) (30-60% of hazardous waste clean-up funds go to lawyers).  -25- 25 interpretation. We note that Charter does not seriously challenge on this point, preferring to argue that its interpretation is mandated and that its interpretation meets the tripartite test. The district court, before entering a consent decree, is obliged to determine that it is fair, reasonable and consistent with the goals of CERCLA. DiBiase, _______ 45 F.3d at 543; Cannons, 899 F.2d at 85. In turn, "an _______ appellate court may overturn a district court's decision to approve or reject the entry of a CERCLA consent decree only for manifest abuse of discretion." Charles George Trucking, _______________________ 34 F.3d at 1085.  Under the terms of the decree Charter agreed to pay $215,000 plus interest, in settlement of the government's claims of approximately $4 million in unrecovered response costs for the first and second units. In exchange the government covenanted not to sue or take administrative action against Charter "pursuant to Sections 106 and 107(a) of CERCLA or Section 7003 of RCRA relating to the Site, including for reimbursement of Response Costs or implementation of ROD I or ROD II."15 Charter also  ____________________ 15. The government's covenant not to sue is subject to certain reservations, including: (a) that with respect to future liability, the covenant not to sue does not come into effect until certification by the EPA that remedial action for the site under ROD I and Rod II is completed; and (b) reopener provisions which allow the government to seek further relief if previously unknown conditions or information reveal that the remedial actions for the site are not protective of human health or the environment. -26- 26 receives protection against contribution claims of other parties from whom the government might subsequently recover ____________ all or part of its multi-million dollar remainder claim. Fairness & Reasonableness _________________________ Fairness has a procedural component (involving the negotiation process, see Cannons, 899 F.2d at 85), which is ___ _______ not at issue here, and a substantive component, which is. Id. at 86. "Substantive fairness introduces into the ___ equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible . . . . The logic behind these concepts dictates that settlement terms must be based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each PRP has done." Cannons, 899 _______ F.2d at 87 (citations omitted); see also Charles George ___ ____ _______________ Trucking, 34 F.3d at 1089 (so long as the basis for a ________ sensible "approximation `roughly correlated with some acceptable measure of comparative fault'" exists, "difficulties in achieving precise measurements of comparative fault will not preclude a trial court from entering a consent decree" (quoting Cannons, 899 F.2d at _______ 87)). -27- 27 A district court's reasonableness inquiry, like that of fairness, is a pragmatic one, not requiring precise calculations. See Charles George Trucking 34 F.3d at 1085 ___ ________________________ (depth of inquiry depends on the context and information available to the court). The question is whether the decree provides for an efficient clean-up and adequately compensates the public for its costs, in light of the foreseeable risks of loss. See Cannons, 899 F.2d at 89-90. Because the first- ___ _______ round settlors have already contracted to implement the clean-up, we review only the adequacy and efficiency of implementing the cash settlement reached here. This amounts to asking whether the terms of the settlement are roughly proportional to Charter's responsibility and whether they serve the public interest. Approval of Charter's cash-out settlement of $215,000 plus interest in exchange for both limited contribution protection and a limited covenant not to sue from the government cannot be said to constitute a manifest abuse of discretion. Although $215,000 is small in absolute terms as compared to the government's total unrecovered response costs of $4 million, it must be evaluated in context. In particular, Charter's liability in this case was uncertain. It was not clear whether Pacific Oil, the company which had contributed to the wastes at the Site, was Charter's predecessor. The degree to which the predecessor's wastes -- -28- 28 soot from oil fuel -- contained hazardous substances that would have contributed to the Site's contamination was also at issue. Given the potentially high costs of litigating a difficult case against Charter and the benefit of a certain cash settlement (and the limited contribution protection), the $215,000 plus interest payment passes muster. This court explained in Cannons: _______ In a nutshell, the reasonableness of a proposed settlement must take into account foreseeable risks of loss. . . . The same variable, we suggest, has a further dimension: even if the government's case is sturdy, it may take time and money to collect damages or to implement private remedial measures through litigatory success. To the extent that time is of essence or that transaction costs loom large, a settlement which nets less than full recovery of clean- up costs is nonetheless reasonable. . . . The reality is that, all too often, litigation is a cost-ineffective alternative which can squander valuable resources, public as well as private.  899 F.2d at 90 (citations omitted). In addition, there are other non-first-round settlors against whom the government is currently seeking to recover the remainder of its $4 million claim. The question arises as to whether the decree, as entered, unfairly hurts the interests of third parties. See ___ Charles George Trucking, 34 F.3d 1085-89 (addressing third- _______________________ party challenge to entry of CERCLA consent decree). For purposes of our review, the district court's determination that the decree does not represent a complete bar to -29- 29 contribution claims that first-round settlors expected to have against those that did not settle along with them is adequate to pass the abuse of discretion threshold.16 Cf. ___ Charles George Trucking, at 1088 (in entering a decree it ________________________ might be better to leave technical disputes between settling parties in a class to the discourse between them). As to the extinguished contribution claims of non-settlors or later round settlors, protection against those claims was a reasonable benefit Charter acquired in exchange for settling before those others.  Fidelity to the Statute _______________________ As we noted in Cannons, the two major policy concerns _______ underlying CERCLA are ensuring that prompt and effective clean-ups are put into place and making sure that the PRPs responsible for the hazards created bear their approximate share of the responsibility. 899 F.2d at 89-91; cf. United ___ ______ States v. Rohm & Haas Co., 721 F.Supp. 666, 680 (D. N.J. ______ _________________ 1989) (noting Congress' goal of expediting effective remedial  ____________________ 16. In the separate contribution action between the Acushnet Group and Charter, Charter had asserted that the consent decree provided it with an affirmative defense against the Acushnet Group's contribution claims. The Acushnet Group, in turn, moved for summary judgment on the issue of whether the decree afforded Charter such a defense. The district court denied the motion without ruling on its merits. It is basically that motion that the parties want us to decide. However, absent unusual circumstances, denial of a summary judgment motion is not independently appealable as a final order. See Pedraza v. Shell Oil Co., 942 F.2d 48, 54-55 (1st ___ _______ _____________ Cir. 1991), cert. denied, 502 U.S. 1082 (1992). No such _____ ______ circumstances exist here. -30- 30 action and minimizing litigation). Both these goals and the honoring of the settlement dynamics Congress created in SARA are effectuated here. CERCLA, through Section 113(f)(2), provides settling parties with broad contribution protection so as to encourage them to settle early. See Browning-Ferris, 33 F.3d at 102- ___ _______________ 03. However, CERCLA also aims to induce those parties who settle earlier to do so for higher amounts than they might otherwise by assuring them the right to seek contribution protection from those who have not as yet settled.17 See ___ 42 U.S.C. 9613(3)(B); see also S. Rep. No. 11, 99th Cong., ___ ____ 1st Sess. 44 (1985); cf. Colorado & Eastern, 50 F.3d at 1535 ___ __________________ (Section 113(f)(1) was intended to enable those bearing a disproportionate share of the liability in a clean-up to recover from others). Hence, a decree that is read not to provide second-round settlors with complete contribution protection against prior settlors is consistent with the goal of enabling the government to enter into early and large  ____________________ 17. An early cash-out settlement may sometimes require the settling party to pay a premium for the risks the government bears out of the uncertainty of the total cost of the remedy. As more is known about the site and as the government decides on the precise remedy, that uncertainty, and hence the premium, is reduced, but not eliminated. Here, there were no settlements until the RODs were issued and the remedy was outlined. Nonetheless, early settlors, even post-ROD, may pay some premium. Settlors who actually perform the remedy, such as the Acushnet Group, assume the risks of the actual costs of performance. Congress may well have thought it fair to require later settlors to bear a share of those risks and premiums.  -31- 31 settlements. Cf. Akzo, 30 F.3d 767 (interpreting "matters ___ ____ addressed" clause of decree not to bar the claims of a PRP that had undertaken remedial work prior to entry of the decree); United States v. Alcan Aluminum, Inc., 25 F.3d ______________ _____________________ 1174, 1186 n.17 (3d Cir. 1994) (in light of the goal of promoting early large settlements, the assertion of a contribution defense by a second-round settlor against a first-round settlor is far more problematic than its assertion against a non-settlor). Conclusion __________ The district court's order entering the consent decree is affirmed. ________ -32- 32