

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-26-2000

# United States v. Southeastern PA Transport. Auth.

Precedential or Non-Precedential:

Docket 99-1479

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"United States v. Southeastern PA Transport. Auth." (2000). *2000 Decisions.* Paper 260.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/260

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 26, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-1479

UNITED STATES OF AMERICA;
COMMONWEALTH OF PENNSYLVANIA,
DEPARTMENT OF ENVIRONMENTAL RESOURCES

v.

SOUTHEASTERN PENNSYLVANIA TRANSPOR TATION
AUTHORITY ("SEPTA"), NATIONAL RAILROAD
PASSENGER CORPORATION ("AMTRAK"), and
CONSOLIDATED RAIL CORPORATION ("CONRAIL")

v.

CITY OF PHILADELPHIA;
PENN CENTRAL CORPORATION,

        Third-Party Defendants

Penn Central Corporation, now known as
American Premier Underwriters, Inc.,

        Appellant

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

(D.C. Civil No. 86-cv-01094)
District Judge: Honorable Robert F. Kelly

Argued April 10, 2000

Before: NYGAARD, ALITO, and GIBSON,* Cir cuit Judges.
_____

*The Honorable John R. Gibson, United States Court of Appeals for the
Eighth Circuit, sitting by designation.

(Filed December 26, 2000)

    James J. Capra, Jr., Esq. (ARGUED)
    Orrick, Herrington & Sutcliffe
    666 Fifth Avenue
    New York, New York 10103

     Counsel for Appellant

    Joel M. Gross, Esq. (ARGUED)
    U. S. Department of Justice
    P. O. Box 7611,
    Ben Franklin Station
    Washington, D.C. 20026

    Paul M. Schmidt, Esq. (ARGUED)
    Commonwealth of Pennsylvania
    Department of Environmental
    Protection
    Suite 6015, Lee Park
    555 North Lane
    Conshohocken, PA 19428-2233

    Bonnie A. Barnett, Esq. (ARGUED)
    Drinker, Biddle & Reath
    1100 PNB Building
    Broad & Chestnut Streets
    Philadelphia, PA 19107

     Counsel for Appellees

OPINION OF THE COURT

JOHN R. GIBSON, Circuit Judge:

American Premier Underwriters, Inc.1  appeals the entry of a consent decree that resolves the liability of Consolidated Rail Corporation (Conrail), National Railroad Passenger Corporation (Amtrak), and Southeastern Pennsylvania

_____

1. American Premier Underwriters, Inc. was previously called The Penn Central Corporation. The Penn Central Corporation ar ose out of the reorganization of Penn Central Transportation Company. For convenience, we will refer to all three entities as American Premier.

Transportation Authority (SEPTA) for environmental contamination at the Paoli Rail Yard Site[2] in Paoli, Pennsylvania. American Premier, a non-settling defendant, argues that the decree unfairly allocates responsibility for cleanup at the Site and that the contribution protection it provides to the settling parties is not permitted under the relevant statute. We affirm.

Operations that involved the service, repair, and storage of rail cars were conducted at Paoli Rail Yard from 1915 until the beginning of 1995. In the 1950s, electric rail cars that used dielectric fluid to cool their transformers were first stored and maintained at the yard. Dielectric fluid contains polychlorinated biphenyls (PCBs). PCBs, which pose substantial risks to human health and the environment, are released during the servicing of train transformers and volatilize if overheated during train operation. Operations at the yard allegedly caused PCB contamination throughout the rail yard property. The contamination eventually spread to other nearby properties through erosion.

From 1915 until 1976, American Premier and its predecessors owned and operated the rail yard. Pursuant to the Regional Rail Reorganization Act of 1973, American Premier conveyed the yard to Conrail on April 1, 1976. That same day, Conrail conveyed the yard to Amtrak. Amtrak still owns the property. Conrail operated the yard from April 1, 1976 until the end of 1982. SEPTA then took over the yard's operation, using it to maintain commuter trains from 1983 until January 1995, when it moved its maintenance operations to a different location. SEPTA gradually phased out the use of dielectric fluid that contained PCBs, ending its use in 1986.

In 1985, EPA representatives observed that access to the rail yard was unrestricted and that people walked through and children played in areas at and near the rail yard. They also saw signs of erosion indicating water runoff from the yard into nearby residential areas. Sampling revealed PCB

_____

2. The Site includes the 28-acre rail yard property and the surrounding 400-acre watershed.

3

contamination in the rail yard and residential soils and in the fish in nearby creeks.

The following year, the United States br ought this action against SEPTA, Conrail, and Amtrak (collectively, the rail companies) pursuant to, inter alia, sections 104, 106(a), and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. SS 9604, 9606(a), and 9607. The gover nment sought injunctive relief and reimbursement of r esponse costs in connection with the release of PCBs at the Site. The Commonwealth of Pennsylvania intervened as a plaintiff later that year.3

In June 1986, the United States, Conrail, and SEPT A petitioned the district court that had overseen American Premier's bankruptcy reorganization to establish their right to proceed against American Premier . See In re Penn Cent. Transp. Co., 944 F.2d 164, 166 (3d Cir. 1991). American Premier's argument that the earlier r eorganization discharged the CERCLA claims was ultimately unsuccessful. See id. at 168. In 1992, the United States filed a separate action against American Pr emier, and the rail companies brought American Premier into this action as a third-party defendant. American Pr emier then sought a declaratory judgment that the government's claims were barred by a 1980 settlement agreement that resolved claims between American Premier and the United States arising from the valuation of American Premier's rail assets conveyed pursuant to the Regional Rail Reorganization Act. See Penn Cent. Corp. v. United States, 862 F . Supp. 437, 448-58 (Regional Rail Reorg. Ct. 1994). The court granted summary judgment to the government on this issue. See id. at 458.

_____

3. In 1979, Pennsylvania's Department of Envir onmental Resources determined that portions of the Site wer e contaminated. The Commonwealth issued an administrative order to the rail companies, requiring them to implement immediate stop-gap measures, assess the contamination, and begin cleanup. The rail companies appealed this order to the Pennsylvania Environmental Hearing Board. The appeal was stayed and eventually transferred to the district court (via a 1990 stipulation) as part of this litigation.

Since the government initiated this action, it has entered into five partial preliminary consent decrees with the rail companies under which they agreed to perform a variety of remedies at the Site. In 1986, SEPTA agreed to construct a combination fence that restricted access to the rail yard and limited further PCB migration into the area surrounding the yard. Later that year, all three rail companies agreed to conduct an engineering study addressing erosion and PCB migration from the rail yard and identifying possible remedies to limit the spread of PCBs. A dispute arose between the United States and the rail companies over the work necessary to implement the study, and EPA ended up constructing sedimentation basins and erosion control systems and removing and disposing of contaminated soil from several residential properties. Under the third partial preliminary consent decree, the rail companies conducted a remedial investigation to determine the extent of PCB contamination at the Site and a feasibility study of various remedial alternatives. As part of this decree, SEPTA entered into a stipulation that addressed worker protection at the rail yard and decontamination of the car shop, a building in which rail cars had been repaired since 1915. Under the fourth partial preliminary consent decree, the rail companies agreed to conduct a soil sampling program to determine the extent of PCB contamination in the residential areas and the surface water channels north of the rail yard. Finally, under the last partial decree, the rail companies excavated approximately 3500 cubic yards of contaminated soils from the residential area north of the yard. All told, the rail companies spent approximately $12 million on remedial action related to the Site before entering into the consent decree that is the subject of this appeal.

EPA placed the Paoli Rail Yard Site on the National Priorities List in 1990. In July 1992, EPA issued a Record of Decision that reviewed remedial alternatives and their projected costs and selected remedies for the Site. As modified, the Record of Decision requires: (1) excavation and on-site treatment of contaminated rail yard soils (estimated cost: $19,507,375), (2) groundwater treatment and fuel oil recovery (estimated cost: $1,131,120), (3)

decontamination and demolition of rail yard buildings and structures (estimated cost: $1,471,905), (4) excavation of contaminated residential soils (estimated cost: $1,196,000), and (5) excavation of contaminated stream sediments (estimated cost: $5,701,720).

In 1995, EPA proposed a consent decr ee that would require all four defendants to clean up the rail yard by carrying out the first three remedies fr om the Record of Decision, while leaving American Premier r esponsible for cleaning up the watershed by carrying out the last two remedies.

In February 1996, American Premier offer ed to pay 20% of past and future remediation costs at the Site as part of a global settlement. American Premier told the rail companies not to view the proposal as a typical"opening bid," thus intimating that it would not be willing to increase its settlement offer. The rail companies responded that they were disappointed with the offer and that they believed that American Premier had "sorely misjudged" the probable outcome if the parties were to litigate. The United States was similarly unsatisfied with the offer .

On September 30, 1996, EPA issued a unilateral administrative order requiring American Pr emier to implement the remedies from the Recor d of Decision related to the watershed portion of the Site. Under this or der, American Premier is responsible for the excavation of residential soils and stream sediments. T ogether, these remedies are estimated to cost $6,897,720.

On July 28, 1997, the United States filed a Praecipe to Lodge Consent Decree, with the proposed decree resolving the rail companies' liability to the United States and the Commonwealth for contamination at the Site. The consent decree contends "that the degree of involvement by American Premier . . . in the disposal of hazar dous substances and the operation at the Site is at least equal to or maybe greater than the degree of involvement by all the Settling parties combined." It requir es the rail companies to excavate and contain the rail yard soils, per form the groundwater treatment and fuel oil r ecovery, and decontaminate and demolish rail yard buildings and

6

structures. Together, these r emedies are estimated to cost $22,110,400. The decree also requir es several payments by the rail companies: $500,000 to the EPA Hazar dous Substance Superfund to reimburse past r esponse costs, $100,000 to the Commonwealth to reimburse past response costs, and $850,000 for natural resource damages.

The decree gives contribution protection to the rail companies for the past, interim, and future r esponse costs of the United States and the Commonwealth and for natural resource damages. It also gives them protection for all remedial actions they have perfor med or will perform at the Site, as well as for the work that American Pr emier is to perform under the administrative or der.

American Premier objected to the proposed settlement by submitting comments both to EPA and to the Commonwealth. On July 30, 1998, the United States moved for entry of the consent decree. American Premier opposed the motion. The district court granted the motion after finding the consent decree procedurally and substantively fair, reasonable, and consistent with CERCLA's goals. This appeal followed.

American Premier challenges the entry of the consent decree on two related grounds. First, it argues that CERCLA does not authorize the contribution pr otection provided to the rail companies by the decr ee. Second, it argues that the district court erred by approving the consent decree because the decree is substantively unfair.

I.

We review a district court's decision to grant a motion for entry of a consent decree for abuse of discr etion. See, e.g., United States v. Cannons Eng'g Corp., 899 F .2d 79, 84 (1st Cir. 1990); United States v. Montr ose Chem. Corp., 50 F.3d 741, 746 (9th Cir. 1995). "We appr oach our task mindful that, on appeal, a district court's approval of a consent decree in CERCLA litigation is encased in a double layer of swaddling." Cannons, 899 F.2d at 84. The first layer is the deference the district court owes to EP A's expertise and to the law's policy of encouraging settlement; the second layer is the deference we owe to the district court's discretion.

7

See id. Thus, American Premier is faced with a "heavy burden" in its attempt to persuade us that the district court abused its discretion by approving the consent decree. See id.

American Premier's argument that CERCLA does not authorize the type of contribution protection granted by the consent decree raises an issue of law, and we exercise plenary review of the district court's decision on this issue. See New Castle County v. Halliburton NUS Corp. , 111 F.3d 1116, 1120 (3d Cir. 1997).

II.

The district court held that the contribution pr otection provided by the consent decree is per missible under CERCLA. Under 42 U.S.C. S 9613(f)(2), "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regar ding matters addressed in the settlement."

Here, the consent decree defines "matters addressed" as

> all claims asserted by the United States and the Commonwealth in their respective complaints and all claims of the United States and the Commonwealth against the Settling Defendants for recovery of"Past Response Costs", "Interim Response Costs","Future Response Costs," and "Natural Resource Damages" as those terms are defined in this Consent Decree, and all claims of the United States and the Commonwealth for all the costs of all past response actions per formed by the Settling Defendants, the costs of, or per formance of, the "Work" as that term is defined in this Consent Decree, and the cost or performance of all Work to implement that portion of the ROD [Record of Decision] which Settling Defendants are not being r equired to implement under this Consent Decree excluding those items covered under the reservation of rights and reopener provisions of Section XXII.

American Premier claims that CERCLA does not authorize the contribution protection provided by the decree. The

8

problem, according to American Premier, is that the decree gives the rail companies contribution protection for the remedies that they will perform under the decree (which are matters addressed in the settlement) and for the remedies that American Premier will perfor m under the administrative order (which are not matters addressed in the settlement). In its view, this is a partial settlement, and the rail companies are only entitled to contribution protection for the remedies they ar e undertaking under the consent decree.

We reject American Premier's view. While legislative history indicates that "Congress contemplated that there would be partial settlements which would leave settling parties liable for matters not addressed in the agreement," United States v. Charter Int'l Oil Co., 83 F .3d 510, 515 (1st Cir. 1996), this is not a partial settlement. The Paoli Site does contain two distinct areas: the rail yar d and the watershed. Under the settlement, the rail companies are responsible for cleaning up the rail yar d. CERCLA does not require, however, that the matters addressed in the decree be limited to the rail yard.

The decree states that the United States and the rail companies "wish to finally conclude . . . all claims and causes of action set forth" in this litigation. This litigation relates to contamination of the entire Paoli Site. The rail companies agreed to take on the remedies necessary to clean up the rail yard in order to r esolve their liability for contamination throughout the Site. Reading this settlement as a whole, it would be reasonable to conclude that the matters it addresses are matters r elated to the entire Site, even without an explicit definition of matters addressed. See John M. Hyson, CERCLA Settlements, Contribution Protection and Fairness to Non-Settling Responsible Parties, 10 Vill. Envtl. L.J. 277, 320 (1999) ("[I]n light of Congress's intent to induce settlements, all settlement[s] should be presumed to afford to the settlors protection against claims for contribution regarding an entir e site, unless there is an explicit provision to the contrary."); see also Akzo Coatings, Inc. v. Aigner Corp., 30 F.3d 761, 771-74 (7th Cir. 1994) (Easterbrook, J., dissenting).

9

Furthermore, including a definition of matters addressed in the decree will foreclose futur e arguments over the scope of the contribution protection.4 See Charter Int'l, 83 F.3d at 517 n.9; Akzo Coatings, 30 F.3d at 768 & n.14. The definition of matters addressed in this decr ee clarifies the extent of the contribution protection that the rail companies are receiving in exchange for their agreement to clean up the rail yard property, r eimburse the United States and the Commonwealth for part of their r esponse costs, and pay for a portion of natural resour ce damages. The district court did not err by holding the contribution protection provided by the decree per missible under CERCLA.

III.

American Premier's second argument is that the district court should not have granted the motion to enter the consent decree because the decree is substantively unfair. A court should approve a proposed consent decree if it is fair, reasonable, and consistent with CERCLA's goals. See United States v. Cannons Eng'g Corp., 899 F .2d 79, 85 (1st Cir. 1990). The terms of a decr ee are substantively fair if they are based on comparative fault and if liability is apportioned according to rational estimates of the harm each party has caused. See id. at 87.

According to American Premier, the court erred in three different ways: (1) by adopting a method of allocating responsibility based on years of ownership and operation, (2) by approving a decree that sets a minimum amount of liability for American Premier while setting a maximum amount of liability for the rail companies, prior to an allocation proceeding, and (3) by approving a decree that immunizes the rail companies from sharing liability for uncertain future costs.

_____

4. While it is possible that the breadth of a matters addressed provision could render a consent decree unfair , that is not this case. See infra, Section III.

A.

As long as the measure of comparative fault on which the settlement terms are based is not "arbitrary, capricious, and devoid of a rational basis," the district court should uphold it. Cannons, 899 F.2d at 87. According to the decree, American Premier's responsibility for contamination at the Site is at least equal to and possibly gr eater than the responsibility of the rail companies combined. The district court accepted as fair the decree's apportionment of liability based on years of ownership of the Paoli Rail Y ard and the likelihood of contamination during those years.

PCBs were used at the rail yard for at least twenty-five years while American Premier owned and operated the yard. Amtrak owned the yard for ten years while PCBs were used. During that ten-year period, first Conrail and then SEPTA operated the yard. Therefor e, American Premier owned and operated the rail yard more than 70% of the time while PCBs were used.

American Premier argues that the district court "wholly disregarded" its settlement proposal, which was based on factors other than years of ownership, to assume 20% of the past and future costs of remediation at the Site. But the district court was not required to accept American Premier's methodology for apportioning liability. Once it found that the decree was based on a rational determination of comparative fault, its task was complete, whether or not it would have employed the same method of apportionment. See id. at 88. The district court did not abuse its discretion by accepting years of ownership and operation as a plausible method on which to judge the fairness of the consent decree.

B.

American Premier contends that the decr ee is unfair because it sets a minimum level of responsibility for American Premier by foreclosing it fr om receiving contribution from the rail companies for its costs, while setting a maximum level of responsibility for the rail companies by leaving them free to bring a contribution action against American Premier. This disparity does not

establish that the decree is substantively unfair or that the district court abused its discretion by entering it.

Taking into account American Premier's share of Site remediation and assuming that it will have to reimburse the United States and the Commonwealth for the remainder of their past response costs and pay natural resource damages, American Premier will be responsible for costs that exceed $17 million. Eventually, the total amount expended on Site remediation and damages, including the $12 million already spent by the rail companies, will likely exceed $53 million. Because of the contribution protection provided to the rail companies, American Premier's minimum share of these costs is 33%. Its share may increase if the rail companies bring a successful contribution action against it.

American Premier's offer to assume responsibility for 20% of the costs was unacceptable to EPA and the rail companies, so they chose to settle without American Premier. The settlement reduces the rail companies' maximum share of liability from 100% to 67% in exchange for their agreement to clean up the rail yard and pay part of past response costs and natural resource damages:

> In most instances, settlement requires compromise. Thus, it makes sense for the government, when negotiating, to give a PRP [potentially responsible party] a discount on its maximum potential liability as an incentive to settle. Indeed, the statutory scheme contemplates that those who are slow to settle ought to bear the risk of paying more . . . .

United States v. DiBiase, 45 F.3d 541, 546 (1st Cir. 1995). The rail companies' share of liability may decrease if they bring a successful contribution action against American Premier.

We recently pointed out that the "intended effect" of protecting settling parties from contribution claims "is that `non-settling defendants may bear disproportionate liability for their acts.' " United States v. Occidental Chem. Corp., 200 F.3d 143, 150 n.8 (3d Cir. 1999) (quoting B. F. Goodrich v. Betkoski, 99 F.3d 505, 527 (2d Cir. 1996)). In Occidental Chemical, EPA had already settled with one potentially

12

responsible party when it issued an administrative order to Occidental, requiring it to participate in the cleanup. See id. at 145. Occidental pointed out that, because the other party obtained contribution protection for matters addressed in the settlement, Occidental could end up paying more than its fair share. See id. at 150 n.8. We responded, "While this is true, it is the result of a deliberate policy choice made by Congress in order to encourage settlements." Id.

It is highly unlikely that this consent decree will result in a final allocation of responsibility for contamination at the Paoli Site. The rail companies will be able to bring a contribution action against American Premier and will be able to offer more specific evidence regarding the relative fault of the parties. The district court will then be able to determine whether American Premier is liable for a portion of the rail companies' costs. If the court chooses to do so, it will be able to take into account the costs incurred by American Premier which are not recoverable through contribution. See 42 U.S.C. S 9613(f)(1) (in a contribution action, "the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate").

This consent decree does set a floor for American Premier's liability while setting a ceiling for the rail companies' liability. That is part of the scheme enacted by Congress, and the district court did not abuse its discretion by rejecting the argument that this result made the decree unfair.

C.

Finally, American Premier argues that the consent decree is unfair because it alone will be responsible for "highly speculative" future costs: those related to its share of Site remediation, natural resource damages, and future response costs of the United States and the Commonwealth. This, too, is an argument based on the contribution protection provided to the rail companies.

In every case where remedial measures have yet to be performed, the future costs are uncertain. But that

13

uncertainty should not be used to hinder settlement. EPA used standard methodologies to estimate the costs of cleaning up the Site, and neither we nor the district court are in a position to second-guess these estimates. See Cannons, 899 F.2d at 90 ("If the figures relied upon derive in a sensible way from a plausible interpr etation of the record, the court should normally defer to the agency's expertise."). The natural resource damages estimate was based on detailed assessments, and if these damages turn out to be "significantly greater" than the $5.3 million estimate, the consent decree does not pr event EPA from pursuing the rail companies for the excess. Finally, we doubt that the United States and the Commonwealth will incur much in the way of future response costs since the consent decree, along with the administrative order, will result in a complete remedy at the Paoli Rail Yard Site.

Whenever a non-settling party is barred fr om bringing a contribution action and work remains to be done, its future liability may exceed present estimates. The district court determined that this possibility did not r ender the consent decree unfair, and we see no abuse of discretion in that determination.

*    *    *

We affirm the entry of the consent decree.

A True Copy:
Teste:

     Clerk of the United States Court of Appeals
     for the Third Circuit