**UNITED STATES of America**

v.

**William M. DAVIS, et al.**

v.

**AMERICAN CYANAMID, et al.**

**C.A. No. 90–484.**

United States District Court, D. Rhode Island.

July 13, 1998.

Lois J. Schiffer, Asst. Atty. Gen., Environment and Natural Resources Division, U.S. Dept. of Justice, Washington, DC, Margaret Curran, U.S. Atty., Providence, RI, Robert E. Maher, Jr. and Susan M. Akers, Environmental Enforcement Section, U.S. Dept of Justice, Washington, DC, Robin Feder and Michael Iannotti, Asst. U.S. Attys. Providence, RI, and Ruthann Sherman, U.S. Environmental Protection Agency, Boston, MA, for U.S.

R. Bradford Fawley, David W. Gartenstein, Brattleboro, VT, for United Technologies Corp.

William G. Beck, Lathrop & Gage, Kansas City, MO, for Browning-Ferris Industries of Rhode Island.

Gregory L. Benik, McGovern, Noel & Benik, Providence, RI, for Radiac Research Corp.

### MEMORANDUM AND ORDER

TORRES, District Judge.

The United States commenced this action, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, to recover response costs associated with remediating a hazardous waste site. The original defendants were United Technologies Corp. ("UTC") and eight other potentially responsible parties ("PRP's"). The United States has moved for entry of a partial consent decree resolving all claims against UTC and forty-seven of the 138 third and fourth-party defendants against whom UTC has asserted claims for contribution.[1]

---

1. The Court previously granted the motion and stated that its reasons would be set forth, more fully, in a written memorandum and order. The consent decree has not yet been entered, in part,

The ultimate issue presented is whether the proposed settlement is fair, reasonable and consistent with the objectives of CERCLA. A narrower sub-issue, and one that no court yet has addressed, is whether the public can be adequately compensated by a settlement in which the United States receives only a portion of the remediation cost from a party previously adjudged liable for the entire cost. Because I answer both questions in the affirmative, the motion to enter the consent decree is granted.

### Background

During the 1970's, a considerable quantity of hazardous waste was dumped at a waste disposal facility in Smithfield, Rhode Island, owned and operated by William M. Davis and his wife, Eleanor Davis (the "Site" or the "Davis Site").

In 1990, the United States commenced this action against the Davises; Capuano Brothers, Inc., and United Sanitation, Inc., two companies that allegedly transported hazardous wastes to the Site; and Ciba–Geigy Corp. ("Ciba–Geigy"), Clairol, Inc. ("Clairol"), Pfizer, Inc. ("Pfizer"), The Providence Journal Co. ("The Providence Journal"), and UTC, companies that allegedly generated the wastes. Specifically, the United States sought recovery, pursuant to § 107 of CERCLA, 42 U.S.C. § 9607(a), for remediation and enforcement costs already incurred and for a declaratory judgment, pursuant to 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), holding the defendants jointly and severally liable for all future response costs.

The response costs were projected to be approximately $55 million and included estimates of $14 million for soil remediation; $13 million for groundwater cleanup and over $3 million for extending a water line to supply nearby residents whose wells had been contaminated.

The case was assigned to Judge Pettine and was transferred to me on August 1, 1997, shortly after Judge Pettine took senior inactive status.

In February of 1993, UTC and several other defendants impleaded 124 third-party defendants in an effort to obtain contribution, pursuant to § 113(f) of CERCLA, 42 U.S.C. § 9613(f), with respect to any amounts for which the original defendants were held liable to the United States. Several third-party defendants, in turn, impleaded twenty-two fourth-party defendants and UTC has asserted direct claims for contribution against most of them.[2]

In addition to its claims for contribution, UTC seeks a declaratory judgment allocating responsibility among all parties. The United States has not asserted claims against any of the third or fourth-party defendants.

Judge Pettine trifurcated the case into three separate phases. Phase I was limited to determining the nine original defendants, liability for response costs. Phase II was to establish the amount of response costs incurred by the United States and Phase III was to deal with all remaining claims, including claims for contribution, indemnification and/or allocation of responsibility.

Prior to the Phase I trial, Judge Pettine entered partial consent decrees formalizing settlements of the United States, claims against Ciba–Geigy, Clairol, Pfizer and The Providence Journal. Pursuant to those agreements, the settling defendants paid a total of approximately $5.8 million to the government.[3]

The case against UTC proceeded to trial; but, for reasons that are not entirely clear, the claims against the other non-settling defendants were held in abeyance. On May 4, 1995, Judge Pettine adjudged UTC jointly and severally liable for all past and future costs at the Davis Site. *See United States v. Davis*, 882 F.Supp. 1217 (D.R.I.1995); *United States v. Davis*, C.A. No. 90–484 (D.R.I.

---

because it contains a provision for certification pursuant to Fed.R.Civ.P. 54(b).

**2.** Fourteen of the fourth-party defendants were new to the case.

**3.** The amounts paid were as follows:

Clairol, $3 million plus interest;
Pfizer, $1.5 million plus interest;
The Providence Journal, $650,000 plus interest; and,
Ciba–Geigy, $475,000 plus interest.

May 4, 1995) (order for declaratory judgment of UTC's liability for response costs).

While preserving its right to appeal that judgment, UTC stipulated with the government that the response costs incurred by the Environmental Protection Agency ("EPA") prior to September 30, 1987, and the enforcement costs incurred by the Department of Justice ("DOJ") prior to September 30, 1994, totaled $9.1 million.[4] The amount of UTC's liability for costs incurred after those dates was left for future determination. The United States and UTC further stipulated that the $5.8 million paid by the four defendants who previously settled would be deducted from the response costs for which UTC would be liable. Those stipulations eliminated the need for a Phase II trial.

The case then proceeded to Phase III which focused on UTC's claim for contribution with respect to costs it already had incurred and its claim for a declaratory judgment allocating responsibility for costs to be incurred in the future. Efforts to reach a global settlement failed; but, they did produce the proposed partial consent decree that has been presented to the Court.

Even though the United States has not pled any claims against the settling third and/or fourth-party defendants, its participation in the consent decree is essential in order to assure the settling PRP's that they will not be subject to future claims by the United States and/or to claims for contribution by any other PRP's that the United States might later sue.[5]

Pursuant to the proposed consent decree, UTC will be responsible for the $14 million soil remediation project; and, UTC and the settling third and fourth-party defendants, jointly, are obligated to pay $13.5 million in cash to the United States. The United States also will be entitled to 50% of the net amount that UTC may recover as contribution from the non-settling third and fourth-party defendants.

Twenty-three non-settling third and fourth-party defendants object to entry of the consent decree on the ground that it does not apportion liability in a matter that is rationally related to each PRP's fair share.[6] BFI also contends that the consent decree fails to adequately compensate the public because UTC already has been adjudged liable for all response costs. In addition, Ashland argues that CERCLA's public comment requirement is not satisfied because the consent decree does not provide sufficient information to enable the public to evaluate it.

### Discussion

*I. Scope of Consent Decree*

■ The threshold issue is whether this Court has authority to enter a consent decree that adjudicates claims by the United States against the settling PRP's that have not been asserted in this action. In general, a court may not enter a consent decree that provides greater relief than the court, otherwise, could have awarded. *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 525, 106 S.Ct. 3063, 3077, 92 L.Ed.2d 405 (1986). Since the United States' claims against the settling PRP's have not been pled and; therefore, could not have been the subject of any relief awarded by this Court, a question arises as to whether those claims can be the subject of a consent decree.

The Supreme Court has held that the entry of consent decrees resolving unpled claims is permissible if the settlement of those claims:

---

4. Those dates were fixed by Judge Pettine as the cut-off dates for determining costs already incurred by the United States.

5. Under CERCLA, a party that enters into a court-approved settlement with the United States or a state is immune from claims for contribution by other PRP's. 42 U.S.C. § 9613(f)(2).

6. Those defendants objecting to the entry of the consent decree are: Acco Bristol Div.; AMF, Inc.; Ashland Chemical Co. ("Ashland"); BFI Waste Systems of North America, Inc. ("BFI"); Black & Decker Corp.; Robert Cece; Chesebrough Ponds USA Co.; City of Jersey City; Cuno Corp.; Ferro Corp.; Giering Metal Finishing; Macera Brother Container Services; Michael Macera; The Mennen Co.; Morton International, Inc. ("Morton"); National Starch & Chemical Co. ("National Starch"); Perkin–Elmer Corp. ("Perkin–Elmer"); Power Semi–Conductors, Inc.; Radiac Research Corp.; Risdon Corp.; Sealed Air Corp.; and Waterbury Plating Co.

1. springs from and resolves a dispute over which the court has subject matter jurisdiction;

2. falls within the general scope of the case as it is framed by the pleadings; and

3. furthers the objectives of the statute upon which the complaint was based.

*Firefighters,* 478 U.S. at 525, 106 S.Ct. at 3077. In this case, all of those requirements are satisfied. The United States' claims against the settling third and fourth-party defendants spring from and fall well within the scope of the controversy described in the pleading; namely, the dispute regarding responsibility for the cost of cleaning up the Davis Site. Furthermore, the United States and all of the settling PRP's are parties to the action and the consent decree resolves the dispute among them. Finally, as discussed below, approval of the consent decree also furthers the objectives of CERCLA by facilitating the prompt and efficient remediation of a major hazardous waste site.

Indeed, the First Circuit has expressly recognized the permissibility of entering a consent decree resolving the United States' unpled claims for natural resource damages. *United States v. Charles George Trucking, Inc.,* 34 F.3d 1081, 1089–90 (1st Cir.1994). In *George,* the Court cited, with approval, the district court's observation that:

> It would have been a foolish or odd consent decree that did not incorporate within it all of the potential claims that can and could have arisen out of th[is] litigation ... [I]t is altogether proper, indeed, in the larger public interest for [the court] to leave no loose threads.

*Id.* at 1090.

It is true that the United States' failure to plead its claims against the settling third and fourth-party defendants has greatly increased the difficulty of assessing the reasonableness of the proposed consent decree and its fairness to non-settling PRP's and to the public. Since those claims have not been pled, there has been no formal discovery delineating their contours or detailing the evidence on which they are based.

Nevertheless, sufficient facts have been presented to enable the Court to make an informed decision regarding approval of the consent decree. Discovery has been conducted with respect to UTC's contribution claims which are based on the same body of evidence and raise the same issues as the United States' claims against the settling third and fourth-party defendants. In addition, the Court conducted a two-day hearing on the motion for entry of the consent decree at which time additional information regarding the terms of the proposed settlement and the justification for it were presented and the non-settling third and fourth-party defendants were afforded an opportunity to present their objections. Consequently, the United States' failure to plead its claims against the settling third and fourth-party defendants does not, by itself, preclude approval of the consent decree. Rather, approval turns on whether the decree is fair and reasonable.

## II. *The Consent Decree*

■ CERCLA expressly requires that a proposed consent decree embodying a settlement of the United States' claims against a PRP be lodged in the appropriate United States District Court. 42 U.S.C. § 9622(d)(1)(A), (d)(2)(A). The United States may not seek entry of the decree until the public has been afforded an opportunity to comment on the decree and the United States has reconsidered the proposed decree after reviewing those comments. 42 U.S.C. § 9622(d)(1)(A), (B); *see* Allan J. Topol and Rebecca Snow, *Superfund Law and Procedure* § 7.15, at 151–52 (1992).

Obviously, the decree cannot be entered unless the Court, first, approves it. The requirement of court approval is intended to help insure that the proposed settlement will serve the public interest by facilitating restoration of the environment and by adequately compensating the taxpayers for the cleanup costs that will be incurred. *United States v. Seymour Recycling Corp.,* 554 F.Supp. 1334, 1337 (S.D.Ind.1982); *see also United States v. Cannons Eng'g Corp.,* 899 F.2d 79, 89–90 (1st Cir.1990) (reviewing courts must determine if consent decree is reasonable in that it is "likely efficacious [ ] as a vehicle for cleansing the environment" and it "satisfacto-

rily compensates the public for the actual (and anticipated) costs of remedial and response measures"). Court approval also significantly impacts the rights of non-settling PRP's because it bars them from asserting contribution claims against the settling PRP's. *See* 42 U.S.C. § 9613(f)(2).

■ Consequently, the approval process is more than a mere formality. The Court does not serve simply as a rubber stamp that automatically places its imprimatur on the proposed settlement. Rather, the Court must make an independent judgment as to whether the proposed settlement is fair and reasonable. *Cannons,* 899 F.2d at 84.

■ That does not mean that the Court should seek to determine whether the proposed agreement is the best one possible. *Id.* Nor should the Court substitute its judgment for the judgment of EPA. The conclusions of EPA as the agency responsible for overseeing implementation of CERCLA, are entitled to some deference. *Id.*

■ Because the fairness and reasonableness of a proposed consent decree depends upon the facts and circumstances of each particular case, there are no precise criteria for determining whether a particular decree should be approved. However, the First Circuit has enumerated four general factors that should be considered:

1. Whether the process for reaching the settlement was procedurally fair.
2. Whether the terms of the settlement are substantively fair.
3. Whether the settlement is reasonable.
4. Whether the proposed settlement is consistent with the statutory goals of CERCLA.

*Id.* at 85.

The United States is obliged to proffer sufficient facts and reasons to establish that these factors have been satisfied and that approval is warranted. *United States v. Pesses,* C.A. No. 90–654, 1994 WL 741277, at *5 (W.D.Pa. Nov.7, 1994).

## A. *Procedural Fairness*

■ In determining whether a proposed settlement is procedurally fair the Court

"should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance," *Cannons,* 899 F.2d at 86. Generally, the requirement of procedural fairness is satisfied if the proposed settlement is reached through arms-length negotiations in which all parties, including non-settlors, are afforded an opportunity to participate and the United States acts in good faith. *Id.* at 87.

In this case, it appears that the settlement process met those requirements. The negotiations were conducted openly and all parties were given an opportunity to participate. In fact, all parties actually did participate both in informal discussions with EPA and UTC and in a global settlement conference mandated by the Court.

Moreover, although the non-settlors have complained about difficulty in obtaining, via discovery, all of the information that they desired, there is no indication that the United States misrepresented or withheld any material facts. Nor is there any indication that the United States acted in bad faith or accorded selective treatment to the settling PRP's. On the contrary, for settlement purposes, EPA grouped the parties based upon its assessment of the volume of hazardous waste that they contributed and the strength of the respective cases against them. EPA then presented aggregate settlement demands to each group and encouraged the parties within each group to negotiate among themselves regarding the response to be made on behalf of the group and how liability would be apportioned among the group members.

## B. *Substantive Fairness*

■ Substantive fairness focuses on fairness to the non-settling PRP's whose right to contribution from the settling parties would be cut off by approval of the settlement. The benchmark for determining substantive fairness is the principle of accountability which holds that "[each] party should bear the cost for the harm for which it is legally responsible." *Id.* Thus, in order to be deemed substantively fair, the "settlement terms must be based upon, and roughly cor-

related with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each PRP has done." *Id.*

Accountability is important because, as already noted, court approval eliminates any right of contribution that a non-settling PRP may have against a settling PRP. Accordingly, if a settling PRP pays less than its fair share, a non-settling PRP, later, may be saddled with liability for more than its fair share in order to make up the deficiency.

Although accountability is of paramount importance, practical considerations prevent liability from being apportioned with absolute certainty or exacting precision. A rough approximation of the responsibility borne by each party is sufficient provided that the method of allocation is rational. *See Charles George Trucking,* 34 F.3d at 1088–89 (class-wide approximation of relative fault among groups of PRP's is reasonable because "[i]t is impossible to explain an allocation of liability in minute detail when, as now, the historical record is incomplete" and because "a muddled record is the norm in most CERCLA litigation"). Furthermore, because of EPA's expertise, courts should be hesitant to reject the method that it devises unless that method is "arbitrary, capricious and devoid of a rational basis." *Cannons,* 899 F.2d at 87. The relevant inquiry is whether EPA has presented a "plausible explanation" as to why the method selected is a reasonable measure of each party's responsibility for the response costs. *Id.*

The goal of apportioning liability based upon the amount of harm caused by each PRP also must take into account the strength of the evidence against each PRP. Thus, it may be appropriate to discount the amount that otherwise would be demanded from a PRP so as to reflect the risk that the United States might not be successful in litigating its claim against that PRP. Once again, in determining whether and to what extent an adjustment should be made, EPA's judgment is entitled to considerable deference. *Id.* at 88 ("[R]eviewing courts should permit the agency to. depart from rigid adherence to formulae wherever the agency

proffers a reasonable good-faith justification for departure.").

In this case the method used to determine accountability was rational. EPA's assessment of relative responsibility was based primarily upon its estimate of the volume of waste attributable to each PRP. That method has been recognized as especially appropriate in cases like this where the wastes have been intermingled and it is virtually impossible to attribute discrete portions of the cleanup cost to particular wastes. *See, e.g., United States v. Union Elec. Co.,* 934 F.Supp. 324, 329–30 (E.D.Mo.1996) ("The fact that liability is based on volume rather than toxicity is not unfair given the evidentiary problems which plague this case."), *aff'd,* 132 F.3d 422 (8th Cir.1997); *United States v. Wallace,* 893 F.Supp. 627, 633 (N.D.Tex.1995) (finding that EPA "reasonably relied on the volumetric allocation formula for allocating liability among the defendants").

In addition, EPA's estimate was based upon its review of the pertinent evidence. EPA examined the records maintained by the Davises; the records of the companies primarily responsible for transporting hazardous waste to the Davis Site; physical evidence found at the Site and statements by Mr. Davis and individual drivers who worked for the transporters.

EPA also gave careful consideration to what it viewed as the strength of its case against each PRP. It took into account that there was direct and credible evidence linking some of the PRP's to the Site and that the evidence with respect to other PRP's was almost entirely circumstantial and varied in probative value.

After weighing these factors, EPA divided the PRP's into two categories. It classified as "carve-out" PRP's those parties that, in EPA's judgment, were responsible for major portions of the hazardous waste found at the Davis Site and against whom the evidence was convincing. The parties deemed to have contributed lesser volumes of waste and/or against whom the evidence was considered less compelling were classified as "non-carve-out" PRP's. Applying the same criteria, EPA subdivided "carve-out" PRP's into several

groups based upon its assessment of their relative degrees of responsibility. EPA then offered comparable settlement terms to the PRP's within each classification or group.

In determining what amount to demand of each "carve-out" PRP group, EPA used the $3 million settlement with Clairol as a benchmark. It considered the case against Clairol to be a strong one because there was direct evidence linking Clairol to the Site. The evidence also indicated that Clairol sent a relatively high volume of waste to the Site. On the other hand, EPA recognized the difficulty of establishing that those wastes were hazardous and not non-hazardous water waste and shampoo, as Clairol contended.

Comparing the amounts being paid by the settling "carve-out" PRP's to the Clairol benchmark and to the demands made upon the non-settling "carve-out" PRP's supports the conclusion that the proposed settlement apportions liability in a manner that roughly approximates a rational estimate of the relative responsibilities borne by both the settling and non-settling PRP's. For example, American Cyanamid Co. and Olin Hunt Specialty Products, Inc., two settling "carve-out" PRP's, agreed to pay $2.75 million each. That figure is slightly lower than the Clairol benchmark because the estimated volume of their waste was less than Clairol's and the evidence connecting them to the Davis Site was not quite as strong. The sums paid are identical to the demands made upon BFI, Ashland and State of New Jersey, three of the eight non-settling carve-out PRP's.[7] In addition, demands of $3 million each, the same amount paid by Clairol, were made upon Morton, Perkin–Elmer, National Starch, 3M and Jersey City, five of the non-settling carve-out PRP's.[8]

There is an even closer correlation between the amounts paid by settling "non-carve-out" PRP's and the amounts demanded from non-settling "non-carve-out" PRP's. When settlement negotiations began, EPA sought a total of $13.5 million from the eighty-five non-carve-out PRP's, are average of $158,800 apiece. The forty-seven non-carve-out.PRP's who are parties to the proposed settlement have agreed to pay $7.2 million, in the aggregate. That is an average of $153,200 each, a figure not appreciably different from the average demand originally made on all of the "non-carve-out" PRP's.

It also is noteworthy that the amounts demanded from the non-settling "carve-out" PRP's were considerably less than the financial obligation imposed on UTC by the proposed consent decree. Under that decree, UTC is responsible for the estimated $14 million cost of soil remediation. In addition, UTC is obliged to contribute $2.8 million of the $13.5 million, in cash, being paid by all of the settling PRP's. Although UTC's share of the cash payment could be reduced by a portion of any amounts that it might recover as contribution from non-settling PRP's,[9] it seems clear that UTC's ultimate liability will be considerably greater than that of any other PRP unless it can prove a lesser degree of responsibility during the Phase III trial.

It is true that, as in most cases of this type, assessing relative responsibility is an imperfect process because it requires subjective judgments based on evidence that is not completely developed and may be disputed. However, as already noted, the evidence need not be exhaustive or conclusive in order to determine whether a proposed settlement is substantively fair. To hold otherwise would require that a case, first, be tried in order to decide whether it can be settled. Such a requirement would be impractical and

---

7. EPA presented a settlement demand of $8.25 million to BFI, Ashland and the State of New Jersey, as a group, an average of $2.75 million each. However, Ashland, apparently, was expected to pay a larger share because EPA determined that Ashland produced a high volume of hazardous waste and that a significant amount of evidence existed linking Ashland to the Davis Site.

8. EPA, since, has increased the demand on National Starch, 3M and Jersey City to $3.5 million apiece because further evidence linking them to the Davis Site has been discovered.

9. The consent decree provides that 50% of the net amount that UTC may recover in contribution within one year after the effective date of the consent decree shall be credited against the first $2.5 million of the $2.8 million cash payment that it is required to make.

would frustrate CERCLA's objective of encouraging early settlement and prompt remediation of hazardous waste sites. Compromise in light of uncertainties and risks presented by further litigation is the very essence of the settlement process.

In short, the requirement of substantive fairness is satisfied when a proposed settlement reflects a rational method of allocating liability in a manner that reasonably approximates each party's share of responsibility; the method is applied evenhandedly with respect to all PRP's and sufficient information is presented to enable the Court to determine whether that has been done. In this case, the requirement has been met.

### C. *Reasonableness*

█ In CERCLA cases, the test for determining whether a proposed settlement is reasonable is whether it "provides for an efficient clean-up and adequately compensates the public for its costs, in light of the foreseeable risks of loss." *United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 521 (1st Cir.1996).

Here, it is clear that the proposed settlement will expedite the soil remediation portion of the cleanup. A waterline serving nearby residents whose wells have been contaminated already has been constructed. However, for reasons that have not been explained, EPA apparently has done little or nothing during the ten years since its Record of Decision ("ROD") was completed to clean up the contaminated soil or the ground water.

The consent decree obligates UTC to proceed promptly with the soil remediation work. Absent that decree, soil remediation would be further delayed, at least, until UTC's appeal from the judgment against it is resolved. By imposing the responsibility of soil remediation on UTC, the consent decree also eliminates any risk that the public might be required to bear any cost that may exceed the estimate of $14 million.

█ A much more troublesome question is whether the proposed settlement fairly compensates the public for the remaining cleanup costs. As already noted, total response costs are estimated at $55 million.

That figure includes $6 million in enforcement costs incurred by DOJ through September 30, 1994 and $19 million in response costs incurred by EPA through April 30, 1996. The balance of $30 million consists of the cost of soil remediation estimated at $14 million; the cost of ground water cleanup estimated at $13 million and $3 million spent after April 30, 1996, to complete construction of the waterline serving nearby residents.

The sum of $5.8 million already has been received from the defendants who previously settled with the United States. Under the terms of the proposed consent decree the United States will receive an additional $27.5 million from UTC and the other settlors leaving $21.7 million in potentially unrecovered costs.

Ordinarily, such a shortfall would not, by itself, be grounds for concluding that the settlement fails to "adequately compensate the public for its costs, in light of the foreseeable risk of loss," because, in the ordinary case, settlement occurs *before* trial. In those cases, compromising for a fraction of the response costs with a PRP that is potentially liable for the entire cost usually is justifiable on the ground that litigation might result in the United States recovering no response costs at all. *See, e.g., id.* (recovery of $215,000 plus interest from settling party instead of total unrecovered response costs of $4 million was reasonable in light of the fact that the liability case against that settling party was difficult); *Charles George Trucking*, 34 F.3d at 1086 n. 3, 1087 (recovery of slightly over half of total estimated response costs from settling defendants was reasonable).

However, in this case, the proposed settlement was reached *after* the Phase I trial when the United States already had a judgment against UTC for all of the cleanup costs. Thus, in effect, the proposed settlement calls for the United States to forego its judgment for unrecovered response costs estimated at $49.2 million (i.e., $55 million less the $5.8 million previously received in settlement) in exchange for soil remediation work valued at $14 million and cash payments totaling $13.5 million. It appears that no court yet has considered whether such a

settlement satisfies the "reasonableness" requirement.

EPA asserts that the proposed settlement provides adequate compensation to the public because the consent decree entitles it to a portion of any amounts that UTC obtains as contribution from the other PRP's. However, since EPA refrained from asserting claims against the contribution defendants, apparently, because it perceived the cases against them to be weaker than the case against UTC; and, since any contribution to which UTC may be entitled is limited to each PRP's *pro rata* share of whatever amount UTC pays in excess of its fair share, there is reason to doubt that all of the remaining response costs will be recovered by those means.

EPA also argues that the proposed settlement adequately compensates the public "in light of the foreseeable risk of loss" because the judgment against UTC could be overturned on appeal. Obviously, that possibility cannot be ignored but the risk of reversal clearly is appreciably less than the litigation risk that existed prior to trial. Thus, the real issue is whether the amount by which the judgment has been discounted reasonably reflects the risk of reversal. That is a very close question.

Certainly, there would be no justification for proffering to UTC the same settlement terms that have been proffered to other comparably situated PRP's against whom the United States does not have judgments. But that is not what the proposed consent decree does. As already noted, it requires UTC to assume responsibility for the soil remediation costs estimated at $14 million and to make a cash payment of $2.8 million which, together, equal 34% of the unrecovered $49.4 million in estimated remediation costs. While those amounts are subject to reduction by contribution payments made by other PRP's, it is clear that the financial obligations imposed on UTC are considerably greater than the obligations assumed by the other "carve-out" settlors and the settlement demands made upon the "carve-out" non-settlors. In light of the fact that the proposed settlement completely eliminates the remaining, albeit diminished, litigation risk associated with the claim against UTC; and, given the deference accorded to EPA's judgment in such matters, it cannot be said that the proposed discount is unreasonable.

Concern that the public may not be fully compensated also is mitigated by the possibility that the United States may, later, sue the non-settling PRP's for any unrecovered response costs. Although that course of action seemingly involves much greater litigation risk than simply pursuing the judgment against UTC, it is a factor to be considered.

Finally, as EPA points out, the public's interest in being compensated for cleanup costs is matched by its interest in preventing a PRP from being saddled, unfairly, with liability for remediation costs that far exceed its fair share. Thus, even though CERCLA's harsh "joint and several liability" provisions permit collecting the entire amount of response costs from UTC, alone, fundamental fairness prohibits the imposition of liability that is totally disproportionate to UTC's share of responsibility.

It is true that a PRP, like UTC, might avoid such a catastrophic result by seeking to negotiate an early settlement with the United States; or, if saddled with such a judgment, by pursuing claims for contribution against other PRP's. However, as this case illustrates, the practical difficulty of negotiating what the PRP reasonably may believe to be a fair settlement and the even greater difficulty of establishing entitlement to contribution seriously diminishes the protection afforded by those options.

### D. *Fidelity to the Statute*

The proposed consent decree is consistent with CERCLA's overriding goal of promptly and efficiently cleaning up hazardous waste sites. As previously noted, it requires UTC to begin, immediately, the soil remediation process that, otherwise, would be further delayed, at least until UTC's appeal is decided. Moreover, it provides additional funds that can be used for other work at the Site. As previously discussed, it also is consistent with CERCLA's purpose of encouraging fair and reasonable settlements with PRP's. *See* 42 U.S.C. § 9622(a); *Cannons*, 899 F.2d at 89.

Ashland's argument that CERCLA's public comment requirement has not been satisfied because the consent decree lacks information sufficient to properly evaluate it is not persuasive. The consent decree was lodged with the Court pursuant to 42 U.S.C. § 9622(d)(1)(A) and (d)(2)(A) and published pursuant to 42 U.S.C. § 9622(d)(2)(B) in order to afford non-parties the opportunity to comment. The proposed decree sets forth, at length, all of the terms of the settlement and its dissemination provided anyone interested with the chance to comment and/or seek additional information.

CERCLA does not require an exhaustive and detailed recitation of every fact relating to the settlement. The parties need only present the terms of the agreement and facts sufficient to enable one to determine whether the proposed "settlement is reasonable, fair and consistent with the purposes that CERCLA is intended to serve." *Id.* at 85 (internal quotation omitted). In this case, that was done.

### Conclusion

It is for all of the foregoing reasons that the motion for entry of the proposed consent decree has been granted.

IT IS SO ORDERED.