**UNITED STATES of America and State of Wisconsin, Plaintiffs,**

v.

**FORT JAMES OPERATING COMPANY, Defendant.**

No. 02–C–0602.

United States District Court, E.D. Wisconsin.

March 19, 2004.

Randall M. Stone, Washington, DC, Jerry L. Hancock, Madison, WI, for Plaintiffs.

John N. Hanson, Washington, DC, for Defendant.

## DECISION AND ORDER

ADELMAN, District Judge.

Plaintiffs United States and the State of Wisconsin brought an action against defendant Fort James Operating Company ("Fort James") pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9675, and the Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. §§ 1251–1387. On June 20, 2002, plaintiffs filed a consent decree with the court and solicited public comment.[1] On August 2, 2002, Clean Water Action Council ("CWAC"), moved to intervene for the purpose of objecting to the consent decree.[2] On May 10, 2003, I denied

---

1. The parties to the consent decree on plaintiffs' side include a number of federal and state agencies as well as several Wisconsin Indian tribes.

2. CWAC is a non-profit organization with about 850 members which, since 1985, has been involved in legal and educational activities aimed at eliminating environmental degradation of the Lower Fox River.

CWAC's motion to intervene but invited it to participate in the case as an amicus curiae, which it did. Before me now is plaintiffs' motion to enter the consent decree, which motion is supported by Fort James. Plaintiffs have submitted a brief in support of their motion, CWAC has submitted a brief in opposition, and plaintiffs have replied.

## I. FACTUAL BACKGROUND

Between the mid–1950s and 1997, seven paper companies, including Fort James, released an estimated 660,000 pounds of polychlorinated biphenyls ("PCBs") into the Lower Fox River in northeastern Wisconsin. The PCBs contaminated a site covering approximately thirty-nine miles of the river and including parts of Green Bay. In the 1990s, the United States Fish and Wildlife Service ("USFWS") began to assess the natural resource damages caused by the contamination. In October 2000, it issued a document entitled the "Restoration and Compensation Determination Plan" ("RCDP"), in which it assessed the natural resource damages at between $176 million and $333 million.

The present settlement addresses two categories of potential liability: (1) Fort James's liability for cleanup costs in connection with a relatively small area of the Fox River known as Sediment Management Units 56 and 57 ("SMU 56/57"), where Ft. James participated in a sediment removal demonstration project designed to eliminate PCBs; and (2) Fort James's liability for site-wide natural resource damages. The first component of the settlement resolves plaintiffs' claims against Fort James for costs associated with SMU 56/57 which were not resolved by a May 2000 Environmental Protection Agency ("EPA") Administrative Order on Consent and takes into account Fort James's prior contribution of more than $22 million for clean-up work performed at SMU 56/57. The natural resource dam-ages component of the settlement was jointly negotiated by federal, state and tribal representatives and designed to replace a previously announced but not finalized state-only settlement. Pursuant to its terms, Fort James will preserve more than 1,060 acres of ecologically valuable wetland and upland habitat in northeastern Wisconsin and pay $8.5 million for other restoration projects as compensation for natural resource injuries. Pursuant to the settlement, Fort James will also pay $1.55 million to help offset natural resource damages assessment costs, and $50,000 for costs associated with SMU 56/57. The settlement does not resolve Fort James's potential liability for cleanup costs for areas outside of SMU 56/57 or its potential liability for natural resource damages discovered after June 20, 2002.

Plaintiffs published notice of the consent decree in the Federal Register and solicited public comment concerning the settlement. *See* 67 Fed.Reg. 44877 (July 5, 2002). More than one hundred comments were received and have been filed with the court.

Additional facts will be included, as relevant, in the discussion section of this decision.

## II. STANDARD OF REVIEW

█ It is well settled that in reviewing a CERCLA consent decree, a district court must satisfy itself that the settlement is reasonable, fair, and consistent with the statutory purposes of CERCLA. *United States v. Davis*, 261 F.3d 1, 20 (1st Cir. 2001); *see also United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1435 (6th Cir.1991); *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 85 (1st Cir.1990).

█ Review of a CERCLA consent decree is committed to the discretion of the district court. *Cannons Eng'g*, 899 F.2d

at 84. However, this review involves "[c]onsiderable deference." *Davis,* 261 F.3d at 21 (stating that a reviewing court must defer to the administrative agency's construction of the settlement); *see also Akzo Coatings,* 949 F.2d at 1436 (stating that judicial deference to settlements reached by the parties to CERCLA litigation is "particularly strong" when that settlement "has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field."); *Cannons Eng'g,* 899 F.2d at 84 ("That so many affected parties, themselves knowledgeable and represented by experienced lawyers, have hammered out an agreement at arm's length and advocate its embodiment in a judicial decree, itself deserves weight in the ensuing balance.").

■ The reviewing court must also keep in mind the strong policy favoring voluntary settlement of litigation. *United States v. Hooker Chem. & Plastics Corp.,* 776 F.2d 410, 411 (2d Cir.1985); *Metro. Housing Dev. Corp. v. Vill. of Arlington Heights,* 616 F.2d 1006, 1014 (7th Cir. 1980). "While the district court should not mechanistically rubberstamp the agency's suggestions, neither should it approach the merits of the contemplated settlement de novo." *Cannons Eng'g,* 899 F.2d at 84. The test is not whether this court would have fashioned the same remedy nor whether it is the best possible settlement. *Id.*

## III. DISCUSSION

### A. Procedural Fairness

■ A consent decree must be both procedurally and substantively fair. *Cannons Eng'g,* 899 F.2d at 86. Procedural

fairness concerns the negotiation process, i.e., whether it was open and at arms-length. *Id.* CWAC alleges that the process in the present case was unfair because plaintiffs did not issue the final Records of Decision ("RODs") for three of the five operable units in the overall site prior to the public comment period.[3] The RODs for these units were issued in July 2003. However plaintiffs attest that the completion of the RODs on these units had no appreciable effect on its view of the estimated damages figure for the site as a whole. Further, it is undisputed that the damages estimate that is the basis for the settlement was contained in the RCDP, which was available to the public during the comment period. Indeed, many of the comments concerning the adequacy of the settlement focused on such estimate. Thus, this argument of CWAC's is not persuasive.

■ CWAC also argues that the settlement is deficient because it was not obtained through arms-length negotiation, and that plaintiffs have not adequately explained how the settlement amount was determined. However, in their principal brief, plaintiffs devote eleven pages to detailing the factors that they took into account in agreeing to the settlement. They discuss the efforts that they undertook to assess and quantify the natural resource damages caused by PCB contamination of the site. They specify the considerations that caused them to enter into the settlement such as the relative costs and benefits of litigation versus settlement. They also explain how they calculated Fort James's share of the total damages. Based on the information plaintiffs present concerning their reasons for agreeing to

---

**3.** A Record of Decision is the official documentation of the final remedial decision. 40 C.F.R. §§ 300.430(f)(4)-(5) (2000). The distinct phases of the entire remedy are termed "operable units" and are defined as "discrete actions that comprise an incremental step toward comprehensively addressing site problems." 40 C.F.R. § 300.5 (2000).

the settlement, I cannot conclude that it was not negotiated at arms length.

Moreover, reviewing courts do not regularly require the level of specificity CWAC demands in order to approve a consent decree. *See, e.g. United States v. Charles George Trucking,* 34 F.3d 1081, 1088 (1st Cir.1994) ("[W]e do not believe that substantive fairness required a more detailed explanation of either the allocation or the allocation method"); *United States v. Davis,* 11 F.Supp.2d 183, 194 (D.R.I.1998) (quoting *Cannons Eng'g,* 899 F.2d at 85) ("CERCLA does not require an exhaustive and detailed recitation of every fact relating to the settlement. The parties need only present the terms of the agreement and facts sufficient to enable one to determine whether the proposed 'settlement is reasonable, fair and consistent with the purposes that CERCLA is intended to serve.'"). Plaintiffs have satisfied this burden in the present case.

CWAC also argues that the process by which the settlement was reached was unfair "because the government led the public to believe that the settlement was $16.1 million, rather than $10.86 million." (R. 49 at 13.) In making this argument, CWAC cites to an unsourced article in the June 21, 2002 *Green Bay Press Gazette.* However, plaintiffs deny that they were the source of the information in this article and point out that the official documents intended to inform the public and provide the basis for public comment—the Federal Register Notice and the Consent Decree— both accurately portrayed the terms of the settlement. Thus, this argument of CWAC's must be rejected.

## B. Substantive Fairness

■ Substantive fairness concerns concepts of corrective justice and accountability. *Cannons Eng'g Corp.,* 899 F.2d at 87. The terms of a consent decree are substantively fair if they are based on the comparative fault and if liability is apportioned in relation to rational estimates of the harm each party has caused. *Id.* In assessing "fairness", courts consider: (1) a comparison of the strength of plaintiff's case versus the amount of the settlement offer; (2) the likely complexity, length, and expense of the litigation; (3) the amount of opposition to the settlement among affected parties; (4) the opinion of counsel; and (5) the stage of the proceedings and amount of discovery already undertaken at the time of the settlement. *United States v. BP Exploration & Oil Co.,* 167 F.Supp.2d 1045, 1051–52 (N.D.Ind.2001) (citing *EEOC v. Hiram Walker & Sons, Inc.,* 768 F.2d 884, 889 (7th Cir.1985)).

■ Given CERCLA's statutory preference for settlements, it is not improper for the government to discount its potential claim to achieve an early settlement. *See Davis,* 261 F.3d at 26 (internal citations omitted) ("Discounts on maximum potential liability as an incentive to settle are considered fair and reasonable under Congress's statutory scheme" and it "is appropriate to factor into the equation any reasonable discounts for litigation risks, time savings, and the like that may be justified"); *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 527 (2d Cir.1996), *abrogation on other grounds recognized by New York v. Nat'l Servs. Indus., Inc.,* 352 F.3d 682 (2d Cir. 2003) ("Courts considering CERCLA cases have recognized that the usual federal policy favoring settlements is even stronger in the CERCLA context."); *In re Acushnet River,* 712 F.Supp. 1019, 1032 (D.Mass. 1989) ("[T]his Court imagines that defendants will generally settle for substantially less—indeed, often for far less given the inherent problems of proof in these cases—than the asserted [natural resource] damages").

■ The settlement in the present case is substantively fair. The most recent es-

timate suggests that Fort James discharged in the range of 15–20 percent of the total PCB mass. The RCDP estimated a range of natural resource damages for the site as a whole at $176 million to $333 million. At 15 percent of $176 million, Fort James's comparative share of liability would be $26.4 million. At 20 percent of $333 million, Fort James's comparative share of liability would be $66.6 million. Under the proposed settlement, Fort James will spend approximately $10.86 million for natural resource restoration projects, equating to about 6.2 percent of $176 million, or 3.3 percent of $333 million. While the amount that Fort James will pay for natural resource restoration projects will not equal its estimated comparative share of overall natural resource damages, plaintiffs present a number of good reasons for discounting their claim against Fort James.

First, plaintiffs point to the risks of litigating the claim and the relative costs and benefits of litigation versus settlement. Litigation risks include the possibility that the statute of limitations applicable to natural resource damages actions would bar any recovery whatsoever, and the possibility that the RCDP greatly overestimates the total potential damages, particularly in view of the state's previous damages assessment. Plaintiffs also note that litigating the natural resource damages claim would be costly and time consuming, and that an early settlement allows restoration work to begin immediately.

Plaintiffs also point out that through the sediment removal demonstration project in SMU 56/57, Fort James has removed approximately one percent of the total PCB mass site-wide, which amount is no longer contributing to natural resource injuries. Additionally, plaintiffs state that it is possible that other parties bear some responsibility for some of the PCBs attributed to Fort James, such as the generators of the PCB-containing wastepaper feedstock that Fort James used. These generators could have liability as CERCLA "arrangers", parties that "arranged for disposal or treatment" of PCB-containing material under CERCLA section 107(a)(3). 42 U.S.C. § 9607(a)(3).

■ Finally, plaintiffs factored in Fort James's status as an early settler. Given CERCLA's joint and several liability scheme, the government may find it appropriate to offer relatively favorable terms to early settlers, thereby encouraging other parties to settle based on the possibility that late settlers and non-settlers bear the risk that they might ultimately be responsible for an enhanced share of the total claim. *See, e.g., United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 515 (1st Cir. 1996) ("[CERCLA's] statutory framework contemplates that [responsible parties] who do not join in a first-round settlement will be left with the risk of bearing a disproportionate share of liability."). In this connection, plaintiffs also note that Fort James deserves credit for stepping forward and completing, at considerable expense, the SMU 56/57 removal action.

CWAC's main argument against the substantive fairness of the settlement is that it does not require Fort James to pay the full amount of its estimated contribution to the natural resource damages. However, as discussed, plaintiffs present a number of good reasons for not attempting to obtain top dollar through litigation, including the risks of litigation and the value of early settlement. In view of CERCLA's preference for settlement as well as the factors cited by plaintiffs, I cannot conclude that the consent decree is not substantially fair. *See, e.g., Davis*, 261 F.3d at 26 (internal citations omitted) ("Discounts on maximum potential liability as an incentive to settle are considered fair and reasonable under Congress's statutory

scheme" and it "is appropriate to factor into the equation any reasonable discounts for litigation risks, time savings, and the like that may be justified").

## C. Reasonableness

 The evaluation of a consent decree's reasonableness is "a multifaceted exercise." *Cannons Eng'g*, 899 F.2d at 89. Often cited factors bearing on the reasonableness include the decree's likely efficaciousness as a vehicle for cleansing the environment; the extent to which it satisfactorily compensates the public for actual and anticipated costs of remedial and response measures; and the relative strength of the parties' litigating positions. *Id.* at 89–90. Other possibly relevant considerations are the availability and likelihood of alternatives to the consent decree and the extent to which approval of it serves the public interest. *BP Exploration & Oil*, 167 F.Supp.2d at 1053.

 Based on the most relevant of the considerations mentioned above, I conclude that the proposed settlement is reasonable. The only imaginable alternative to settlement would be complex and probably lengthy litigation. *See id.* And while the consent decree does not mandate that Fort James pay its full equitable share of the natural resource damages, when viewed in light of the benefits of early settlement and CERCLA's joint and several liability scheme, it appears to satisfactorily compensate the public for Fort James's share of estimated natural resource damages.

Plaintiffs also persuade me that the settlement is in the public interest. The settlement will enable plaintiffs to acquire and protect more than 1,060 acres of identified wetland and upland habitat and establish a $1.3 million fund for the purpose of financing the acquisition and protection of up to 600 additional acres. Thus, approximately 17–24 percent of the total acreage proposed by the RCDP in its wetland preservation/restoration category will be protected. The settlement will also pay for such restoration projects as about 650 acres of constructed island habitat and restored aquatic habitat as part of the Cat Island Project, and 35–40 more acres of constructed aquatic habitat as part of the Oneida Tribe Lake Project (representing about 21–30 percent of the habitat restoration proposed by the RCDP). The settlement will further provide $3.9 million for specific recreational enhancement projects (representing 16–32 percent of the total amount of recreational enhancements proposed by the RCDP). Finally, the settlement will provide $3.3 million for water quality improvement, fishery enhancement and habitat improvement projects (representing 2–11 percent of the water quality improvement projects proposed by the RCDP).

CWAC argues that the proposed settlement is unreasonable because too much money is earmarked for recreational enhancement projects. The RCDP for the site proposed a 5–10 percent long term enhancement to local park facilities but the consent decree earmarks about 36 percent of the $10.86 million that Fort James will pay toward natural resource damages to such projects. Plaintiffs, however, argue that recreational fishing losses due to consumption of PCBs are a significant component of the total natural resource damages in the case and that the projects will benefit local communities. Plaintiffs also represent that future settlements will weigh more heavily toward natural resource restoration actions, so that, at the completion of the settlement/litigation process, recreational enhancement projects will not account for more than the 5–10 percent initially proposed by the RCDP. While CWAC's concerns about disproportionate spending on recreational enhancements are legitimate, I am not willing to scrap on

this basis the positive features of the settlement, such as the purchase of 17–24 percent of the total acreage proposed by the RCDP in its wetland preservation/restoration category and meeting 21–30 percent of the habitat restoration proposed by the RCDP.

For the reasons stated, on the whole, the settlement is reasonable.

### D. Fidelity to Statute

■■■ The final criterion on which to judge a consent decree is the extent to which it is consistent with statute on which the claims are based. *See BP Exploration & Oil* 167 F.Supp.2d at 1054. "Of necessity, consideration of the extent to which consent decrees are consistent with Congress' discerned intent involves matters implicating fairness and reasonableness" and "cannot be viewed in majestic isolation." *Cannons Eng'g*, 899 F.2d at 90. Nevertheless, several major policy concerns underlie CERCLA:

First, Congress intended that the federal government be immediately given the tools necessary for a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal. Second, Congress intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created.

*Id.* at 90–91; *see also Davis*, 261 F.3d at 26 ("The purposes of CERCLA include expeditious remediation at waste sites, adequate compensation to the public fisc and the imposition of accountability.").

■■■ Further, as stated, there is also a strong statutory preference for settlement in CERCLA cases. *See B.F. Goodrich*, 99 F.3d at 527 ("Courts considering CERCLA cases have recognized that the usual federal policy favoring settlements is even stronger in the CERCLA context."). Set-

tlements in CERCLA cases promote one of CERCLA's primary goals—expeditious remediation. *See United States v. DiBiase*, 45 F.3d 541, 545 (1st Cir.1995) ("[S]ettlements reduce excessive litigation expenses and transaction costs, thereby preserving scarce resources for CERCLA's real goal: the expeditious cleanup of hazardous waste sites"); *In re Acushnet River*, 712 F.Supp. at 1027 (stating that it was "Congress' intent to encourage CERCLA settlements and reduce the time and expense of enforcement litigation that necessarily diverts money from cleanup and restoration").

■■■ In the present case, the proposed settlement is consistent with the statutory goals of CERCLA. It imposes accountability on Fort James, allows restoration work to begin and reimburses the public for at least a share of its costs. The discount that Fort James will receive is consistent with CERCLA's strong statutory preference for settlement. *See Davis*, 261 F.3d at 26.

## IV. PUBLIC COMMENTS

Plaintiffs adequately explain why, after considering the public's comments, they nevertheless remain convinced that the settlement is fair, reasonable and consistent with CERCLA. (R. 40 at 26–45.) The concerns expressed in the comments largely overlap those of CWAC, which I have attempted to address above. However, to the extent that they do not, the comments do not convince me that the consent decree is not fair, reasonable and consistent with CERCLA.

## V. CONCLUSION

For the above reasons, I find the proposed consent decree fair, reasonable and consistent with CERCLA's statutory purposes.

**THEREFORE, IT IS ORDERED** that plaintiffs' joint motion to enter the consent decree (docket number 38) is **GRANTED.**

**IT IS FURTHER ORDERED** that plaintiffs' joint motion to authorize disbursements from the court registry account (docket number 37) is **GRANTED.**